Page 1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                   WESTERN DIVISION
3
       UNITED STATES FOR THE USE
4      AND BENEFIT OF MID STATE
       CONSTRUCTION COMPANY,
5      INC. AND MID STATE
       CONSTRUCTION COMPANY,
6      INC.
                                              PLAINTIFFS
7
8      V.            CIVIL ACTION NO. 5:11 CV 169 DCB-JMR
9
       TRAVELERS CASUALTY AND
10     SURETY COMPANY OF
       AMERICA; US COATING
11     SPECIALTIES & SUPPLIES,
       LLC; AND EARL WASHINGTON
12                                            DEFENDANTS
13
       30(B)6 DEPOSITION OF MID STATE CONSTRUCTION COMPANY
14                        BILLY WARE
15
16   Taken at the instance of the Defendants at Bradley
     Arant Boult Cummings, LLP, 188 East Capitol Street,
17   Suite 400, Jackson, Mississippi, on Thursday, May 9,
                 2013, beginning at 9:02 a.m.
18
19
     APPEARANCES:
20
21
         RALPH B. GERMANY, ESQ.
22       Bradley Arant Boult Cummings, LLP
         188 East Capitol Street, Suite 400
23       Jackson, Mississippi 39201
24
25          COUNSEL FOR PLAINTIFF

EXHIBIT D

```
 1         Q.    This was the first time you had proposed
 2    that with a Job Corps project?
 3         A.    Yes.
 4         Q.    Okay.  Okay.  At the time you -- do you
 5    remember when you first started discussing with Mr.
 6    Washington the Corps of Engineers project
 7    Mr. Washington or the Corps project?
 8         A.    I don't recall the exact time, and it may
 9    have been a lot closer to the Job Corps project than
10    I -- than I remembered earlier.  It may -- because
11    the job -- the Corps project bid date was such a
12    moving target, it may very well have ended up being
13    more or less concurrent.
14         Q.    Okay.  At the time you were having these
15    discussions with Mr. Washington, to your knowledge,
16    had U.S. Coating ever served as a general contractor
17    on a project of that size and scope?
18         A.    No.
19         Q.    When you were discussing this with him,
20    did you do anything to determine what the financial
21    capability of U.S. Coating was at the time you were
22    having those discussions?
23         A.    Did I do anything to determine his
24    financial?
25         Q.    Yes.
```

```
 1            THE WITNESS:  I feel like we had a meeting
 2   of the minds.
 3         Q.   (By Mr. Herbert)  Okay.  And I don't want
 4   to be repetitive, but tell me as you thought you had
 5   the meetings of the mind, what was the deal
 6   Mr. Washington had?
 7            MR. GERMANY:  Same continuing objection.
 8            THE WITNESS:  As I described it before,
 9   Mid State would assist with the bond procurement,
10   would provide project management, project accounting
11   capabilities to the job and would act as a
12   subcontractor for what we determined to be the
13   critical portions of the work.
14         Q.   (By Mr. Herbert)  And you would split
15   profits?
16         A.   Yes.
17         Q.   Any other major terms?
18         A.   That the funds would be held and disbursed
19   jointly.
20         Q.   Was that something Mr. Washington was okay
21   with or --
22         A.   He was fine with that.
23         Q.   Okay.  On the subcontract portion of this,
24   let me ask, make it easy.  What portions of the work
25   was U.S. Coating going to reserve to self perform?
```

```
 1        Q.   Okay.  Did you have meetings with Jen
 2   Moore and others or Jen Thompson and others about
 3   this particular project?
 4        A.   No, the correspondence went mainly through
 5   our agent where he would say Jen Thompson asked for
 6   this.  We would provide that to him.  He would
 7   forward that to her.  But we did not have any
 8   meetings regarding this particular bond.
 9        Q.   Do you know if you had any meetings with
10   your agent with Earl Washington present and
11   participating?
12        A.   No.  He had another agent.
13        Q.   Do you know who that was?
14        A.   I know it was Bottrell Agency, but I don't
15   know who the individual was.
16        Q.   In the -- in the -- I'll just call it the
17   deal you had with U.S. Coating, who was going to pay
18   the bond premium?
19        A.   I don't recall.
20             MR. GERMANY:  Object to the form of the
21   question.
22             THE WITNESS:  I don't recall.
23        Q.   (By Mr. Herbert)  Do you know who actually
24   did pay the bond premium?
25        A.   Yes.
```

```
 1      Q.   Who did?
 2      A.   Mid State Construction.
 3      Q.   I assume a bid was put together and
 4   submitted to the Corps of Engineers?
 5      A.   Yes.
 6      Q.   And that was done under the name of U.S.
 7   Coating, correct?
 8      A.   Correct.
 9      Q.   With a bid bond?
10      A.   Yes.
11      Q.   Okay.  Who actually put the bid together?
12      A.   We put an estimate together, they put an
13   estimate together.  We phoned them our number.  They
14   had a representative at the bid opening.  We phoned
15   them our number.
16      Q.   Was your number, Mid State's number, only
17   for your scope of work?
18      A.   No, it was our total number, and a total
19   estimate.
20      Q.   For the entire project?
21      A.   Because we had taken sub prices and vendor
22   prices, and they were taking subcontractor and
23   vendor prices.
24      Q.   Okay.  Let me be sure I understand that.
25   You came up with a total bid number for the project
```

```
 1    subcontract, which was irrelevant to him, and then
 2    he would do his own accounting at U.S. Coating or
 3    wherever for his benefit, but there would be a
 4    overall project accounting maintained through --
 5    through our system.
 6         Q.   Okay.  Do you know if U.S. Coating had any
 7    kind of job cost accounting system or -- set up at
 8    all?
 9         A.   They had some sort of system.  It was a --
10    I think it was a QuickBooks based system.
11         Q.   Who would actually cut the checks to pay
12    for all these expenses, including subcontractors,
13    direct subs to U.S. Coating?
14         A.   That was -- depended on who -- whether it
15    fell under our subcontract -- the project -- the
16    checks for the overall project would be cut by the
17    escrow agent, Trustmark.
18              (Exhibit 7 marked for identification.)
19         Q.   Mr. Ware, we have marked as Exhibit 7,
20    Employee Lease Agreement.  This is Mid State 408.
21    I'll ask you some specific questions, but tell me
22    what the purposes of this agreement was.
23         A.   The purpose of the agreement was to
24    provide the superintendent and the assistant
25    superintendent for the project.
```

1      Q.   Were they identified people or just to be
2   identified later?
3      A.   Well, they were Steve West and Stacy
4   Blakely.
5      Q.   Okay.  And those were full-time employees
6   of Mid State?
7      A.   Yes.
8      Q.   And they were going to perform as project
9   superintendent and assistant superintendent on the
10  job site under this lease agreement?
11     A.   For Mr. Washington, for U.S. Coating.
12     Q.   Who was going to directly supervise their
13  activities?
14     A.   Alden Brooks was the on-site manager.
15  Mr. Washington was also providing project management
16  services in some scope.  I'm not exactly sure where
17  the lines went, and of course, Mid State had a
18  project manager on -- you know, for our portions of
19  the work.
20     Q.   I guess my question is would these people
21  report to Mr. Brooks, or would they report to some
22  other Mid State employee when they're out in the
23  job?
24     A.   I think they basically reported to
25  Mr. Washington.

Page 97

1  A. Correct.
2  Q. And they had not done that, either, had
3  they?
4  A. No.
5      (Exhibit 27 marked for identification.)
6  Q. We have marked as Exhibit 27 a letter from
7  Mr. Washington to you. It's Mid State document 402,
8  and it attaches a document entitled "Agreement
9  Regarding Sharing of Job Profits."
10     Now, this is a little bit out of
11 chronology, I understand. Mr. Washington says,
12 "It's imperative that this agreement represents our
13 verbal agreement. Please return one original with
14 both signatures to me."
15     Did anyone from Mid State ever execute
16 this agreement?
17 A. I don't know if this is the agreement that
18 was ultimately executed or not.
19 Q. Was some form of an Agreement Regarding
20 Sharing of Job Profits executed between Mid State
21 and U.S. Coating?
22 A. I think so.
23 Q. I have not seen a copy of that document.
24 I just -- and I can't say that I've looked at every
25 document that's been produced?

1      A.   Like I say -- well, I didn't say.
2   Documents such as this were exchanged, and I -- I
3   think that we ultimately executed one, but I
4   don't -- I'm not positive about that.
5      Q.   Well, to the extent you believe one was
6   eventually executed, was it along these terms?  Were
7   these terms correctly stated as the agreement
8   between Mid State and U.S. Coating regarding sharing
9   of job profits?
10     A.   Generally, yes.
11     Q.   Point out to me anything that isn't the
12  agreement between the parties that is misstated in
13  this document that is attached to the e-mail,
14  Exhibit 27.
15     A.   I don't see anything that looks contrary
16  to -- to our agreement.
17     Q.   Okay.  So except for the fact it's not
18  signed, this is an accurate recitation of the
19  agreement between Mid State and U.S. Coating
20  regarding sharing of job profits, correct?
21          MR. GERMANY:  Object to the form.  It
22  calls -- again, it calls for a legal conclusion.
23          THE WITNESS:  I would hate to be proven
24  wrong if there is -- if there is another one that is
25  executed that might -- you know, but I don't -- I

Page 99

```
 1   think that this represents the terms of the
 2   agreement.
 3         Q.   (By Mr. Herbert)  And that's fair.  I'm
 4   not asking to pin you down.  That's why I asked you
 5   if there was anything in here that you saw that was
 6   not according to your recollection.
 7         A.   The accounting is off, but the agreements
 8   could have been that simple.
 9         Q.   Okay.  Mr. Washington's letter is dated
10   February 1, 2011, which we have seen from previous
11   exhibits that are substantially after the agreements
12   in November of 2010.  Do you know why this document
13   is being submitted to you in February of 2011?
14         A.   Well, the "job buyout" was still going on,
15   subcontracts being written, whatnot.  I mean,
16   obviously, we didn't get our subcontract until
17   November -- late November.  So that final estimated
18   cost to the project had not even been determined so
19   that it's -- I don't know of a reason why, but
20   it's -- it certainly seems appropriate that it would
21   be about in that time frame.
22              (Exhibit 28 marked for identification.)
23         Q.   Mr. Ware, Exhibit 28 is an e-mail from
24   Mr. Germany to Mr. Irvin dated February 2nd, 2011.
25   I understand you didn't write it, but Mr. Germany
```