**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DISTRICT**

**UNITED STATES EX REL. MID STATE CONSTRUCTION COMPANY, INC.**                                                **PLAINTIFFS**

**VS.**                                                **CIVIL ACTION NO. 5:11 CV 169 DCB-MTP**

**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA ET AL.**                                                **DEFENDANTS**

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Travelers Casualty and Surety Company of America ("Travelers") submits this Memorandum in Support of its Motion for Summary Judgment against Mid State, U.S. Coating, and Earl Washington and in support thereof would state the following:

## I.      INTRODUCTION AND RELIEF REQUESTED

The instant civil action relates to a federal construction project set aside under the United States Small Business Administration's 8(a) program between the U.S. Army Corps of Engineers ("Corps"), as owner, and U.S. Coating Specialties and Supplies, LLC ("U.S. Coating") as general contractor for the Corps Engineer Research and Development Center ITL Office Building and Computer Facility in Vicksburg, Mississippi (the "Project"). As required by the Miller Act (40 U.S.C. §§ 3131 *et seq.*), U.S. Coating was required to post payment[1] and performance[2] bonds (collectively "bonds").   U.S. Coating did not have the requisite financial wherewithal to obtain surety credit from Travelers.   As a result, Mid State requested that

---

[1] A payment bond protects certain claims presented by protected claimants as defined by the Miller Act.

[2] A performance bond protects the project owner in the event the general contractor is unable to complete the project.  If that occurs, the surety has several options to choose from to have the project completed.

Travelers issue bonds on behalf of U.S. Coating based on Mid State and its principals' bonding credit. Mid State and its principals agreed to serve as corporate and individual indemnitors, respectively, in conjunction with U.S. Coating and its President, Earl Washington ("Washington") and his wife, Alberta Washington (now deceased) all of whom signed indemnity agreements to induce Travelers to issue payment and performance bonds on behalf of U.S. Coating. The nature of the relationships between Travelers, as surety, and Mid State and its principals, U.S. Coating and Mr. and Mrs. Washington, as indemnitors, are akin to a lender/borrower rather than an insurer/insured because the issuance of the bonds is the surety's extension of credit. *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 845 (1st Cir. 1969) (insureds are not expected to reimburse the insurers for loss; surety credit is underwritten, on the other hand, on the premise that the indemnitor is fully responsible for all surety loss).

Although Mid State voluntarily undertook the obligation to indemnify Travelers, Mid State brought a Miller Act claim against the payment bond issued by Travelers. As set forth below, Mid State's claims against Travelers are barred either by the circle of indemnity doctrine and/or because Mid State was a joint venture partner with U.S. Coating. Mid State, its principals, U.S. Coating, and Earl and Alberta Washington are contractually obligated to indemnify Travelers from and against all loss.

Travelers seeks summary judgment from this Court as follows:

1)     That Mid State is jointly and severally liable for Travelers's losses in an amount to be proven at trial.

2)     That Mid State's payment bond claim and claim to enforce the arbitration award against U.S. Coating are due to be dismissed as a matter of law.

{JX020607.1}
2

3)      That Mid State's defenses for failure to mitigate, breach of the implied duty of good faith and fair dealing, and misrepresentation are due to be struck as a matter of law.

4)      That U.S. Coating and Earl Washington are jointly and severally liable for Travelers's losses in an amount to be proven at trial.

5)      That U.S. Coating and Earl Washington's defense of bad faith is due to be struck as a matter of law.

6)      Alternatively, if the Court determines Travelers is not entitled to summary judgment dismissing Mid State's payment bond claim and claim to enforce the arbitration award, Travelers is entitled to a credit for all sums paid to Mid State's subcontractors and suppliers.

## II.      FACTS

### A.      Mid State, U.S. Coating, and Washington's Indemnity Obligations.

On July 28, 2009, Mid State and its principals, William Ware and Paul George Bernheim executed a General Agreement of Indemnity ("Mid State GAI"). *See* Exhibit "A". U.S. Coating and its President, Washington, and his wife, Alberta Washington, likewise signed a similar General Agreement of Indemnity ("U.S. Coating GAI), and on June 24, 2010, Mid State signed a rider to the U.S. Coating GAI ("GAI Rider"), making it a party to the U.S. Coating GAI. *See* Exhibit "B". Pursuant to the terms of these documents, (collectively referred to as the "GAI") Mid State and its principals, U.S. Coating, and the Washingtons agreed, among other things, to the following:

> ***Indemnitors shall exonerate, indemnify and save [Travelers] harmless from and against all Loss***. An itemized, sworn statement by an employee of [Travelers], or other evidence of payment, shall be prima facie evidence of the propriety, amount and existence of Indemnitors' liability. Amounts due to [Travelers] shall be payable upon demand.

*See* Exhibits "A" and "B" at ¶ 3 (emphasis added).

> Loss – All loss and expense of any kind or nature, including attorneys' and other professional fees, which [Travelers] incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of [Travelers's]: (a) making any investigation in connection with any Bond; (b) prosecuting or defending any action in connection with any Bond; (c) obtaining the release of any Bond; (d) recovering or attempting to recover Property in connection with any Bond or this Agreement; (e) enforcing by litigation or otherwise any of the provisions of this Agreement; and (f) all interest accruing thereon at the maximum legal rate.

*Id.* at ¶ 1 Definitions.

> Claim Settlement:    [Travelers] shall have the right, in its sole discretion, to determine for itself and Indemnitors whether any claim, demand or suit brought against [Travelers] or any Indemnitor in connection with or relating to any Bond shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors. [Travelers] shall be entitled to immediate reimbursement for any and all Loss incurred under the belief that it was necessary or expedient to make such payments.

*See* Exhibit "B" at ¶ 4.

**B.    Dispute Between Mid State and U.S. Coating.**

In 2010, Mid State and U.S. Coating negotiated the terms of various agreements to serve as the framework for their relationship on an 8(a) set-aside project for the Corps in Vicksburg. One of those agreements was to share in profits. *See* Exhibit "C". Though not signed, Mid State testified that this agreement memorialized the agreement of the parties as it related to profit sharing. *See* Exhibit "D" at 97:6 through 99:21. That agreement provides, "[i]n April 2010, [U.S. Coating and Mid State] elected to submit a bid proposal to the U.S. Army Corps of Engineers for the construction of the ERDC/ITL Building in Vicksburg, Mississippi . . . [U.S. Coating] proposed to Mid State that the two firms would prepare a bid for the job and, if awarded, construct the building and share the profits. [U.S. Coating] submitted the bid as prime contractor. Mid State, through its relationship with Travelers Surety obtained a bid bond for [U.S. Coating] to submit with their bid." *See* Exhibit "C". That agreement further provides,

{JX020607.1}

4

"[U.S. Coating and Mid State] have further agreed to execute the work of the Contract in a cooperative manner, each contributing resources and expertise as needed to benefit the profitability of the job . . . the two parties agree to share in the profits of the job."  *See* Exhibit "C".  Mid State testified that it had no profit built into its subcontract work but looked solely to the profits remaining at the end of the job to cover operating costs.  *See* Exhibit "E" at 31:9 through 32:12.

On or about June 21, 2010, U.S. Coating entered into a $13,613,000[3] contract (the "Contract") with the Corps for the construction of the Project, which involved constructing a building to house sophisticated computer equipment. Due to the nature of the Project being set aside by the SBA, the relationship between Mid State and U.S. Coating was unconventional as compared to a typical construction project. The unconventional nature of their relationship revolved around the provision of payment and performance bonds as required by the Miller Act. 40 U.S.C. §§ 3131 *et seq.* As set forth below, their relationship is categorized as a joint venture rather than a typical prime contractor/subcontractor relationship.

As a small contractor, U.S. Coating never had the experience of constructing and managing the construction of a $13,613,000 building. *See* Exhibit "D" at 32:14-18.  Mid State testified that based upon its experience with U.S. Coating, Mid State had no confidence that U.S. Coating could complete the Project without Mid State's assistance. *See* Exhibit "E" at 14:7-14; 15:18 through 16:10.  Because U.S. Coating had no such experience or bonding credit, Travelers would not provide a bond to U.S. Coating. However, Mid State loaned U.S. Coating its bonding credit with Travelers, and requested Travelers to provide payment and performance bonds (the "Bonds") for the Project.  *See* Exhibit "F".  Travelers provided Mid State and U.S. Coating with

---

[3] The Contract between U.S. Coating and the Corps reached this amount through agreed upon change orders.

the Bonds based on their indemnity obligations to Travelers.  *See* Exhibits "A" and "B".  The premium for the Bond was paid by Mid State, and billed to U.S. Coating.  *See* Exhibit "D" at 39:23 through 40:2.

In furtherance of their business arrangement, Mid State and U.S. Coating entered into several contractual agreements, the first of which was the June 23, 2010 Agreement Regarding Bonding Credit[4] whereby Mid State agreed to extend its bonding credit to U.S. Coating and to serve as a major subcontractor.  Under the Agreement Regarding Bonding Credit, the following provisions are relevant:

- •     Mid State loaned  its bonding capacity to U.S. Coating so that U.S. Coating could obtain the prime contract for the Project by providing the Bonds. (DE #1-6, ¶ A)

- •     Mid State acknowledged that Travelers provided the Bonds in reliance on the indemnity agreements of Mid State, Ware and Bernheim. (DE # 1-6, ¶ B)

- •     As consideration, a major portion of the work was to be subcontracted to Mid State at which time Mid State would request Travelers to issue the Bonds.
(DE # 1-6, ¶ 1)

- •     Mid State, Mr. Bernheim and Mr. Ware had the right to determine whether claims on the Bonds and/or under the Contract should be paid, settled, or comprised. (DE # 1-6 at ¶ 3)

- •     Upon the occurrence of a default, Mid State had the right to, among other things, take possession of the work under the contract with the Corps, take over subcontracts, take possession of U.S. Coating's property to utilize same to complete the contract without payment for such use, take possession of funds, etc.
(DE # 1-6, ¶ 5)

- •     U.S. Coating appointed Mid State, Mr. Bernheim, and Mr. Ware as its attorney in fact to exercise U.S. Coating's rights.  (DE # 1-6 at ¶ 6)

- •     An account was set up whereby U.S. Coating was to deposit the Contract funds over which Mid State had control. (DE # 1-6 at ¶ 8)

*See* DE # 1-6 (Exhibit "E" to Mid State's Complaint").

---

[4] U.S. Coating and Mid State also executed an Amended and Restated Agreement Regarding Bonding Credit on November 18, 2010, which supplemented, but did not replace the original agreement.

On November 19, 2010, Mid State and U.S. Coating entered into a $5,884,492 subcontract (the "Subcontract") giving Mid State a major subcontracting role on the Project. *See* DE #1-4. On November 23, 2010, Mid State and U.S. Coating entered into an Escrow Agreement and Assignment of Contract Proceeds giving Mid State and U.S. Coating control over the Project funds from the Corps. *See* DE #1-8 and #1-9. The relevant terms of these agreements include, but are not limited to, the following:

- U.S. Coating was to place all proceeds from the Contract into the escrow account. (DE #1-9, ¶ 1)
- Mid State was to be in "control" of the escrow account and Project funds within the meaning of Miss. Code Ann. § 75-9-104.  (DE #1-8, ¶ 9)
- Mid State had authority to direct the disposition of the Project funds in the escrow account without U.S. Coating's consent. (DE #1-8, ¶ 9)

Mid State acknowledged in pleadings that the purpose of having joint control over the Project funds was for the payment of legitimate Project bills and expenses of both Mid State and U.S. Coating to avoid indemnity obligations to Travelers. *See* Exhibit "A" to DE #6 ¶¶ 7 and 8.

After executing all the documents, Mid State began work and payment disputes arose concerning Mid State's pay applications for April 2011, May 2011 and June 2011. *See* DE #1-23, p. 4. On May 19, 2011, Mid State put U.S. Coating in default of the Escrow Agreement.  *See* Exhibit "G". Due to U.S. Coating's alleged failure to pay, Mid State left the Project on June 14, 2011. *See* Exhibit "H".  On or about June 30, 2011, Mid State made a claim against the very payment bond issued by Travelers at Mid State's behest and paid for by Mid State.  *See* Exhibit "I".  Subsequent to  Mid State's departure from the Project prompted a number of its own subcontractors and suppliers to make claims against the payment bond.

To date, Travelers has received a total of thirty-two (32) payment bond claims totaling at least $3,231,912.45 in potential losses, including the payment bond claim submitted by Mid State.  Currently, Travelers has paid thirteen (13) of those payment bond claims at a loss of not

less than $699,572.08.  *See* Exhibit "J".  Moreover, on April 25, 2012, the Corps submitted a

performance bond claim, for which Travelers incurred a loss of not less than $1,059,461.  *Id.*

Travelers has also incurred attorneys' fees and costs defending eight (8) lawsuits brought by Mid

State and its or U.S. Coating's subcontractors and suppliers. *Id.* To date, Travelers has incurred

not less than $297,503.50 in attorney's fees and not less than $3,896.92 in costs defending said

lawsuits.  Travelers' loss, cost, and expenses are continuing to accrue.

### III.    STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled

to summary judgment:

> If the pleadings, depositions, answers to interrogatories and admissions on file,
> together with affidavits, if any, show there is no issue as to any material fact that
> the moving party is entitled to judgment as a matter of law.

*Behrens v. Pelletier*, 516 U.S. 299, 116 S. Ct. 834, 840, 133 L. Ed. 2d 773 (1996).

Once the moving party presents a basis for summary judgment, the non-moving party

must present sufficient evidence to create a factual dispute on material issues.  *See* Fed. R. Civ.

P. 56(3).  Factual disputes must be both genuine and material and "if the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted."  *See Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Summary judgment is appropriate in any case where a party fails to establish an essential

element of its claim and on which it bears the burden of proof at trial.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  A complete failure of proof on an

essential element of the claim renders all other facts immaterial because there is no longer a

genuine issue of material fact.  *Id.*  When the moving party meets its burden of demonstrating the

absence of a genuine issue of material fact due to the complete failure of proof on an essential

element of the claim, the burden shifts to the opposing party to demonstrate that a genuine issue of material fact exists for trial.  The opposing party must set forth specific facts showing there is a genuine issue for trial.

## IV.   ARGUMENT AND AUTHORITIES

### A.   Travelers is Entitled to Summary Judgment With Regard to its Indemnity Claims Against Mid State,  Ware, Bernheim, U.S. Coating, and Earl and Alberta Washington.

The first issue Travelers would have the Court decide is Mid State, U.S. Coating, and Washington's liability to Travelers for the losses incurred on the Bonds in furtherance of their respective executions of the GAI agreements.  *See* Exhibits "A" and "B".  Both the United States District Court of Appeals for the Fifth Circuit and the Mississippi Supreme Court have recognized that the interpretation of a written contract is a question of law.  *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002) (citing *Fina, Inc. v. ARCO*, 200 F.3d 266, 268 (5th Cir. 2000); *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998); *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins.*, 99 F.3d 695, 700 (5th Cir. 1996)). *See also*, *Warwick v. Gautier Utility Dist.*, 738 So. 2d 212, 215(Miss. 1999); *Mississippi State Highway Comn'. v. Patterson Enters., Ltd.*, 627 So. 2d 261, 263 (Miss. 1993). Travelers' counterclaim is a diversity action based on state breach of contract law, thus, Mississippi law is applicable.  *Quorum Health Resources, L.L.C.*, 308 F.3d at 458.

### 1.   Indemnity agreements are enforceable via summary judgment.

In 1901, the Mississippi Supreme Court addressed a guaranty company's indemnity claim against its principal for sums paid pursuant to an employee's bond.  *Guarantee Co. of N. Am. v. Pitts*, 30 So. 758 (Miss. 1901).  As a condition to obtaining the guarantee sought, Pitts stipulated and/or contracted that he would indemnify the Guarantee Company of North America for any "loss, damage, or expense it may sustain or become liable for . . . ."  *Id.*  After having paid

{JX020607.1}

9

several claims made by the employer, the Guarantee Company of North America filed suit against Pitts demanding judgment against him for the amount paid to the employer.  *Id.*  Pitts denied the claim, and the trial court agreed and gave judgment in favor of Pitts.  Id.

On appeal, the Mississippi Supreme Court reversed the trial court holding,

***Parties sui juris may lawfully make such stipulations, and are bound by them****.  Under such contract **the company was authorized** in advance, as a condition of guaranteeing, **to exercise discretion as to paying any demand** made by the holder of the guarantee, **and was bound only to act without fraud in settling a claim, and, thus paying, is entitled to hold the party guaranteed for reimbursement**; and the voucher [or receipt for the payment] proves the claim, if not shown to have been infected with fraud.  The expense, delay, trouble, and risk of loss to the guarantee company is a sufficient safeguard against an unwarranted payment . . . .*

*Id.* (emphasis added).

Courts have consistently enforced the terms of indemnity agreements in favor of the surety.  *See Engbrock v. Fed. Ins. Co.*, 370 F.2d 784, 786 (5th Cir. 1967); *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715 (5th Cir. 1995) (district court granted surety's summary judgment motion) (citing *First Natl. Ins. Co. of Am v. Wunderlich*, 358 F. Supp. 2d 44 (N.D.N.Y. 2004) (granting summary judgment in favor of surety, holding indemnity agreements between contractors and their sureties are valid and enforceable)); *Gen. Acc. Ins. Co. of Am. v. Merritt-Meridian Constr. Corp.*, 975 F. Supp. 511, 516 (S.D.N.Y. 1997) (granted summary judgment in favor of surety who settled claims under bonds).  According to *Pitts*, the GAI before the Court is an enforceable contract, and Travelers is entitled to assert the rights and obligations set forth therein.

Courts interpreting the provisions of an indemnity agreement hold that sureties are entitled to the protection these clauses afford as "sureties serve '[an] important function in the construction industry' by providing to all of the parties to a 'typical construction' contract – owners, general contractors, subcontractors' – 'assurance that defaults by any of the myriad other

{JX020607.1}

10

parties involved will not result in a loss to them.'" *Gundle Lining Construction Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 211 (5th Cir. 1996); *First Nat'l Ins. Co. of Am. v. Wunderlich*, 358 F. Supp. 2d 44, 51 (N.D.N.Y. 2004).

> **2.      Travelers was entitled to settle and pay all claims presented and the sworn affidavit of Mrs. Ziv-Goldstein proves the claim.**

The terms of the indemnity agreements at issue provide Travelers with the right to settle and pay claims made against the payment and performance bonds.  Once those claims are settled, Travelers is entitled to be indemnified for the losses incurred.  Those provisions provide:

> Company shall have the right, in its sole discretion, to determine for itself and indemnitors whether any claim, demand or suit brought against Company or any indemnitor in connection with or relating to any Bond shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the indemnitors. Company shall be entitled to immediate reimbursement for any and all Loss incurred under the belief that it was necessary or expedient to make such payments.

*See* Exhibits "A" and "B" at ¶ 4.

> ***Indemnitors shall exonerate, indemnify and save [Travelers] harmless from and against all Loss***. An itemized, sworn statement by an employee of [Travelers], or other evidence of payment, shall be prima facie evidence of the propriety, amount and existence of Indemnitors' liability. Amounts due to [Travelers] shall be payable upon demand.

*See* Exhibits "A" and "B" at ¶3 (emphasis added).

The GAI agreements give Travelers the right, in its sole discretion, to determine what claim(s) should be paid.  *See* Exhibits "A" and "B" at ¶ 4.  "Travelers shall be entitled to immediate reimbursement for any and all Loss incurred under the belief that it was necessary or expedient to make such payments."  *Id.*  This language clearly and unambiguously gives Travelers the right to settle any and all claims presented to it.

Paragraph 3 of the GAI states, "[a]n itemized, sworn statement by an employee of [Travelers], or other evidence of payment, shall be prima facie evidence of the propriety, amount

and existence of [Mid State's] liability"  *See* Exhibits "A" and "B" at ¶ 3.  According to ¶ 3 of the GAI, a sworn affidavit from Travelers is prima facie evidence of the existence of Mid State's liability to Travelers.  *See* Exhibits "A" and "B".

The Mississippi Supreme Court has stated, "the voucher [or receipt for the payment] proves the claim, if not shown to have been infected with fraud."  *Pitts*, 30 So. 758; *see also Gundle Lining Construction Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 211 (5th Cir. 1996)(Court upheld voucher clause holding the fact and extent of a principal's liability to the surety may be prima facie established by vouchers or affidavits.  Bad faith on the part of the surety may be urged as a defense; however, where the summary judgment evidence does not raise a genuine issue of material fact, reliance on a bad faith defense is ineffective).

### a.      Payment Bond Claims

The coverage of the payment bond extends ". . . to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made."  *See* Exhibit "F".  The coverage of the payment bond is also conditioned on those claimants and claims that fall within the coverage of the Miller Act.  *See* 40 U.S.C.A. § 3131 *et seq.*

Concerning payment bond claims, "Courts have recognized that 'as a practical matter the suppliers and small contractors on large construction projects need reasonably prompt payment for their work and materials in order for them to remain solvent and stay in business.'"  *Id.* (citation omitted). The *Wunderlich* Court noted further "[a]bsent bad faith, fraud or extravagance, the surety is entitled to pay the actual costs incurred in completing the construction

project and then be provided indemnification pursuant to the agreement." *Wunderlich*, 358 F. Supp. 2d at 52.

In June 2011, Mid State left the project.  After Mid State left the Project, Travelers received payment bond claims from subcontractors and suppliers who were in privity of contract with both Mid State and U.S. Coating.  To date, Travelers has incurred losses of not less than $699,572.08 under the payment bond.  *See* Exhibit "J". Travelers has not paid all payment bond claims presented, but paid thirteen (13) of thirty-two (32) claims received. *Id.*  Its investigation is on-going with regard to certain of the payment bond claims received.  With regard to all of the payment bond claims paid by Travelers, Mid State testified that it had no disputes with the claims paid its subcontractors and suppliers or had no basis to dispute claims paid to U.S. Coating's subcontractors and suppliers.  *See* Exhibit "E" at 38:1 through 48:7.  Travelers seeks summary judgment from this Court that Mid State is liable for the amounts incurred by Travelers, the exact amount to be proven at trial.

b.    <strong>Performance bond claim.</strong>

In explaining the subtle differences between performance and payment bond claims the *Wunderlich* Court stated, "[w]here the surety provides a bond to the owner of a construction project on behalf of the contractor and said owner determines that the contractor has defaulted and demands the surety, pursuant to the terms of the bond, to fulfill the contractor's obligations, the surety, generally speaking, is obligated to comply regardless of the surety's belief as to what occurred or caused the claim of default." *Wunderlich*, 358 F. Supp. 2d at 52 (citation omitted); *Gen. Accident Ins. v. Merritt-Meridian*, 975 F.Supp. at 516 (holding an owner's "claims of default invoke indemnification agreements and the settlement of claims")).  Moreover, it is generally held that within the rights and obligations of a GAI, "sureties are provided discretion

and latitude to take whatever action necessary to settle claims and to complete the work at hand." *Gen. Accident Ins. v. Merritt-Meridian*, 975 F.Supp. at 516.

The terms of Travelers's performance bond guarantees that U.S. Coating will perform and fulfill ". . . all the undertakings, covenants, terms, conditions, terms, conditions, and agreements of the contract during the original term of the contract . . . ." *See* Exhibit "F." On April 25, 2012, the Corps terminated U.S. Coating's contract and made a claim against the performance bond. *See* Exhibit "K". U.S. Coating's termination from the Project was not finalized by the bankruptcy court until May 17, 2012. Thereafter, Travelers investigated the claim, put together a scope of work, put together a bid package, obtained bids, analyzed those bids, and awarded the rebid on or about September 25, 2012. *See* Exhibit "J". After awarding the rebid, Travelers provided the Corps with a check for $1,059,461 representing the difference between the lowest bid received and the available contract funds. *See* Exhibit "J". Travelers seeks summary judgment as to Mid State's liability for the losses incurred under the performance bond, the exact amount to be proven at trial.

The aforementioned exhibits, therefore, prove Travelers's claim against the Mid State, and the burden shifts to Mid State to prove that the exhibits proving Travelers's claim are not infected with fraud or bad faith. *Pitts*, 30 So. 758.

> **3.     To Defeat Summary Judgment, the Defendants must Prove Travelers acted in Bad Faith and the Settlements Reached were Tainted with Fraud.**

In upholding a surety's right to pay claims presented to it, the Mississippi Supreme Court held that a surety is "bound only to act without fraud in settling a claim, and, thus paying, is entitled to hold the party guaranteed for reimbursement; and the voucher proves the claim, if not shown to have been infected with fraud." *Pitts*, 30 So. at 759 (emphasis added). Travelers's right to settle the claims involved herein pursuant to the indemnity agreements is limited only by

{JX020607.1}

14

the obligation of good faith and the absence of fraud. *Id.* The Fifth Circuit also adheres to this

approach. *Engbrock*, 370 F.2d 784. In *Engbrock*, the Fifth Circuit held that an indemnitor may

successfully attack payments made by the surety only by pleading and proving fraud or lack of

good faith by the surety. *Id.* at 786. Other courts around the United States also adhere to this

general rule that "[a]s long as the surety acts in good faith in assuming the remaining contractual

obligations and pay [sic] construction expenses accordingly, whether the contractor actually

defaulted will neither affect the surety's right to be indemnified for expenses paid nor defeat the

surety's motion for summary judgment." *Wunderlich*, 358 F. Supp. 2d at 52 (citations omitted).

> **a.    Mid State, U.S. Coating and Washington have not sufficiently alleged Travelers acted with fraud in settling claims.**

As set forth above, to defeat a surety's indemnity action, an indemnitor must plead and

prove that the payments made by the surety were fraudulent. *Pitts*, 30 So. at 759. In cases of

fraud, Rule 8(a) requires fraud to be affirmatively stated and Rule 9(b) has long played the

gatekeeper to discovery as a tool to weed out meritless fraud claims. The Fifth Circuit has held,

"[w]e apply Rule 9(b) to fraud complaints with 'bite' and 'without apology,' but also aware that

Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not

'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations

of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not

merely conceivable, when taken as true." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 -

186 (5th Cir. 2009).

Mid State's answer to Travelers's indemnity counterclaim alleges, "Travelers' claims are

barred by its misrepresentations." *See* DE No. 41 at Aff. Def. No. 8. However, Mid State does

not set forth specifically the circumstances of the alleged misrepresentation. At no place in its

answer does Mid State allege that any payment made by Travelers was the result of fraud as

required by *Pitts*. *Id.* This does not satisfy the specificity requirement of F.R.C.P. 9(b) and plausibility requirement of *Twombly*. *Grubbs*, 565 F.3d at 185-186.  Because, Mid State has failed to specifically plead fraud as an affirmative defense to Travelers's claims with particularity and has brought forth no set of facts that would support a finding that the payments made by Travelers were tainted with fraud, Mid State's Affirmative Defense No. 8 is due to be struck as a matter of law. Additionally, U.S. Coating and Washington's answer fails to specifically allege that the payments made by Travelers are tainted with fraud. *See* DE No. 49.

### b. Mid State cannot prove Travelers acted with fraud in settling claims.

In addition to failing to plead fraud with particularity, Mid State cannot prove that the payments made by Travelers were tainted with fraud.  *See* DE No. 41 at Defense No. 8.  The elements of fraud or misrepresentation in Mississippi are well established.  They include (1) a representation of a fact, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.  *Welsh v. Mounger*, 883 So. 2d 46, 48 (Miss. 2004) (*citing Martin v. Winfield*, 455 So. 2d 762, 764 (Miss. 1984)).  The Mississippi Supreme Court noted that "proving fraud is difficult, as it ought to be" and requires [that all nine elements be proven by] clear and convincing evidence.  *Id.* (citations omitted).

In response to written discovery requesting the factual basis of the alleged misrepresentations, Mid State incorporated its response to Interrogatory No. 8 (which fails to mention fraud or misrepresentation) and answered "Mid State refers to Travelers' bankruptcy court pleadings representing that Travelers would act promptly as to take-over and/or complete

the project." *See* Exhibit "L" at Interrogatory Response Nos. 14 and 15.  When questioned about

the alleged misrepresentation, Mid State's 30(b)(6) designee testified:

> Q.      Okay. Does Mid State contend the representation in the bankruptcy
> pleadings were made to Mid State?
>
> Mr. Germany: Object to the extent it calls for a legal conclusion.
>
> The witness: No.

*See* Exhibit "E" at 86:4-9.

Mid State further testified that it had no personal communication with Travelers

regarding the timing of Travelers's takeover or what Travelers's intention were post-termination.

*Id.* at 86:16-20. Mid State has failed to establish any facts establishing fraud in settling claims as

required by *Pitts*. Because Mid State admits that Travelers made no representation to Mid State,

Mid State cannot prove that it relied on the alleged misrepresentation or that it had a right to rely

on the alleged misrepresentation thus destroying a fraud claim. *Mounger*, 883 So. 2d at 48.

Mississippi law also provides that a claim of fraudulent representation cannot be

predicated on a promise of future action. *Spraggins v. Sunburst Bank*, 605 So. 2d 777 (Miss.

1992). The basis for Mid State's misrepresentation claim is that Travelers allegedly made

representations in the bankruptcy action concerning how quickly it would take over or complete

the project once the Corps terminated U.S. Coating. Travelers's representations in bankruptcy

pleadings that it would promptly take over or complete the project, assuming such statements

were made, constitute a promise of future action rather than a representation of fact for which

there is no claim for fraud.  *Spraggins*, 605 So. 2d 777.

In establishing a claim for fraud, it must be remembered that not any claim for fraud will

suffice. Mid State must plead and prove that the payments made by Travelers were tainted with

fraud. Representations regarding the timing of a Project takeover do not render payments made

under the payment or performance bonds fraudulent. Consequently, Mid State's misrepresentation defense must be struck as a matter of law.

> c. **Mid State, U.S. Coating, and Washington have no proof the payments made by Travelers were made in bad faith.**

The final hurdle to clear before making a determination that Travelers is entitled to recover on its counterclaim is to question whether the payments made by Travelers were not made in good faith. *Pitts*, 30 So. at 759; *see also Engbrock*, 370 F.2d 784. Attached as Exhibit "J" is the affidavit of Mrs. Ziv-Goldstein who testifies that she has investigated approximately thirty-two (32) payment bond claim submitted to Travelers regarding the Project. Of those claims, she determined that only a portion of eleven (11) were due and owing and made payment to those claimants. *See* Exhibit "J". Mid State testified it could not identify any dispute with these claims. *See* Exhibit "E" at 38:1 through 48:7.

Most courts addressing the standard of bad faith have held that an indemnitor, like Mid State, must show more than simply bad judgment, lack of diligence, negligence or gross negligence on the surety's part. *Frontier Ins. Co. v. International, Inc.*, 124 F. Supp. 2d 1211 (N.D. Ala. 2000) (lack of good faith carries implication of dishonest purpose, conscious wrongdoing, breach of duty through motives of self-interest or ill will; lack of diligence or even gross negligence cannot support finding of bad faith).

In *Engbrock*, and much like Mid State herein, the indemnitors attempted to escape liability on the basis that the surety "did not do what it should have done in order to limit or minimize the costs on [the project]." 370 F.2d at 787. Affirming the judgment in favor of the surety, the Fifth Circuit reasoned:

> At most, the pleading alleges negligence by [the] Surety. But neither lack of diligence nor negligence is the equivalent of bad faith; and improper motive, which is not alleged is an essential element of bad faith . . . . Hence, we conclude that it was not error for the

trial judge to deny admission into evidence the testimony of [the indemnitors] that the payments were excessive.

*Id.*

Mid State also submitted a defense that Travelers breached the implied duty of good faith and fair dealing. *See* DE No. 41 Def. No. 2. Alleging the breach of duty of good faith and fair dealing alone is not enough. Rather than regurgitating the implied duty, Mid State was required to submit a defense stating specifically what payments Travelers made were done so in bad faith. Having failed to allege bad faith payment on the part of Travelers, Mid State's Defense No. 2 is due to be struck.

Notwithstanding, Travelers sought through written discovery the basis for Mid State's defense. In support of its defense that Travelers breached the duty of good faith and fair dealing, Mid State alleged in sum, that Travelers failed to act timely to gain control of the project, protect the project funds, cooperate with Mid State in allowing Mid State to participate in the rebid of the Project. *See* Exhibit "L" at Mid State's response to Interrogatory Nos. 8 and 9. Mid State has also designated Mr. Ken Ryan as an expert to support these contentions. *See* Exhibit "M". Mr. Ryan testified that his opinion that Travelers lost its indemnity rights is supported by the following legal conclusions (1) Travelers failed to adequately investigate, (2) Travelers failed to cooperate with Mid State, (3) Travelers failed to protect the project funds, and (4) Travelers failed to control and/or avoid the losses on the project. *Id.* at p. 15 ¶ (j). Mr. Ryan's ultimate opinion is that Travelers lost its right to indemnity against Mid State because "Travelers was seriously negligent and derelict in timely acting . . . ." *Id.* at p. 16 ¶ (j). Moreover, Mr. Ryan testified repeatedly that Travelers lost its indemnity rights due to its negligence. *See* Exhibit "N" at 125:10 through 126:6. Mr. Ryan's report and testimony contains no proof whatsoever that any payment made by Travelers was made in bad faith or with an improper motive. Because

{JX020607.1}

negligence is not a defense to a surety's indemnity action, and Mid State has no proof of bad faith or improper motive, Mid State's defense that Travelers's indemnity claim is barred because it breached the duty of good faith and fair dealing is due to be struck as a matter of law. *Engbrock*, 370 F.2d 784; *Frontier Ins. Co.*, 124 F. Supp. 2d 1211.

> **d.   Mid State's failure to mitigate defense is due to be struck as a matter of law.**

Mid State has also alleged that Travelers failed to mitigate its damages. *See* DE No. 41 at Def. No. 4.  However, as established by *Pitts* and *Engbrock*, Mid State's mitigation of damages defense must be analyzed through the lens of whether the surety's payments were tainted with fraud and/or bad faith.  In fact, the *Engbrock* court addressed an indemnitors argument that the surety did not do what it should have done to limit or minimize costs on the project, which is a typical mitigation of damages argument presented by an indemnitor. *Engbrock*, 370 F.2d at 787. The Fifth Circuit rejected the indemnitors testimony that payments were excessive due to the failure to plead bad faith and/or improper motive on the part of the surety. *Id.* Specifically, the Court held that negligence is not the equivalent of bad faith. *Id.*

In the case at bar, Mid State has not alleged that Travelers failed to mitigate damages in bad faith or with an improper motive. Rather, in support of their contention that Travelers allegedly failed to mitigate its damages, Mid State has designated Mr. Ken Ryan as an expert. *See* Exhibit "M". Mr. Ryan's expert report does not state that Travelers (1) payments were the result of fraud or bad faith, or (2) that Travelers failed to mitigate damages in bad faith. *See* Exhibit "O". Rather, and just like the indemnitors in *Engbrock*, Mr. Ryan stated in his report and testified at his deposition that Travelers lost its right to indemnity because "Travelers was seriously negligent and derelict in its duties to mitigate damages . . . ."[5] *See* Exhibit "O" at p. 16;

---

[5] Most of Mr. Ryan's are legal opinions, and Travelers has filed a Motion to Strike him as an expert.

{JX020607.1}

*see also* Exhibit "N" at 115:1 through 116:3. As established by *Engbrock* and *Pitts*, negligence does not rise to the level of bad faith, and does not constitute a defense to the surety's right to be indemnified. As a result, Mid State's mitigation of damages defense is due to be struck.

**e.  U.S. Coating's defense is due to be struck.**

It their answer, U.S. Coating and Washington alleged that Travelers's damages are barred due to Mid State's bad faith and tortuous interference with U.S. Coating's contract, and because Travelers did not take remedial action.  *See* DE No. 49 at Def. No. 2. As set forth above, the only defense to a surety's indemnity action is for an indemnitor to plead and prove that the payment made or loss incurred by the surety was the result of fraud/collusion or was made in bad faith. *Pitts*, 30 So. at 759; *see also Engbrock*, 370 F.2d 784. To prove bad faith, U.S. Coating must prove that Travelers made payments with an improper motive. *Engbrock*, 370 F.2d at 787. U.S. Coating has alleged no defense that the payments made by Travelers were the result of bad faith. In fact, U.S. Coating has not alleged Travelers acted in bad faith, but alleged Mid State acted in bad faith. Travelers is under no duty to take remedial action to protect U.S. Coating from Mid State's bad faith or tortuous interference. *See* GAI at Exhibit "B". U.S. Coating has designated no expert witness to testify that Travelers owes U.S. Coating a duty to protect it from the bad faith or tortuous interference of Mid State. Moreover, the undersigned has located no cases in which a court has held the surety must protect a principal from another indemnitor (especially a case with the type of agreements and rights as exist between Mid State and U.S. Coating). Because U.S. Coating bears the burden of proving that Travelers's losses were the result of bad faith and improper motive, U.S. Coating and Washington's defense is due to be struck as a matter of law.

Case 5:11-cv-00169-DCB-MTP   Document 122   Filed 06/14/13   Page 22 of 30

**B.      Mid State's Payment Bond Claim is Barred.**

Mid State has two affirmative claims for which Travelers is entitled to summary judgment. *See* DE No. 36, Counts I and II.  Count I is a claim against the payment bond under the Miller Act. *Id.* Count II is a claim to enforce an arbitration award Mid State obtained against U.S. Coating. Mid State's response to Travelers's Interrogatory No. 16 asserts that Mid State is entitled to recover on the bond claim in the amount of the arbitration award. *See* Exhibit "L". Thus, Mid State's payment bond claim and claim to enforce the arbitration award are one and the same.

**1.      Mid State's payment bond claim is barred by its Indemnity Obligations to Travelers and/or the Circle of Indemnity Doctrine.**

Mid State's Miller Act claim and claim to enforce the arbitration award against Travelers is barred by the "circle of indemnity" or "circuity of action" doctrine, pursuant to which a cause of action is extinguished "when as a result of indemnification obligations or settlement agreements between the parties, a plaintiff would end up indemnifying another party for its own claim. *Toyota Motor Sales, Inc. v. Farr*, 320 F. Supp. 2d 496, 498 (S.D. Miss. 2003); *In re Guardianship of Lane*, 994 So. 2d 757, 760 (Miss. 2008).

As set forth above, Travelers has shown that it is entitled to summary judgment that Mid State is liable for losses incurred under the payment and performance bonds. Mid State is required to indemnify Travelers for those losses. Additionally, based on the clear language of the indemnity agreement, if Travelers is required to pay anything toward Mid State's payment bond claim, as an indemnitor, Mid State would be required to pay that back to Travelers vis-à-vis the terms of the GAI.  *See* Exhibits "A" and "B" at ¶¶ 1, 3 and 4.  Mid State's indemnity obligations to Travelers thus destroy its Miller Act and Arbitration Enforcement claims. *See* DE No. 36, Counts I and II.

{JX020607.1}

Additionally, on August 15, 2011, counsel for Mid State wrote Mr. Lanny Robinson, deputy counsel for the Corps, a letter stating, "On April 21, 2010, Travelers wrote the Corps advising that Mid State had provided fundamental "surety support" (i.e. bonding credit under the indemnity agreements of Mid State and its principals) necessary to secure the payment and performance bonds for the Project… That letter made it clear that Mid State and its principals were the ones truly at risk under the bonds.  That means that Mid State and its principals are effectively the ones with the surety risk, which means that they are the ones at risk for all payment bond claims and for performance bond claims. That means that Mid State has no remedy insofar as making a payment bond claim for non-payment insofar Mid State's role as the major subcontractor." *See* Exhibit "P" at pp. 1-2.  In response to the Corps' direction to make a payment bond claim, Mid State's attorney stated further, "Obviously at that point the Corps was not presently remembering that this was a meaningless option since Mid State's indemnity underwrote the bonds." *Id.* at p. 3.   If that wasn't enough, Mid State's attorney further acknowledged, as did the Corps, ". . . payment bond claims are not an option for Mid State." *Id.* at p. 8.

According to the terms of the GAI, Mid State's own lawyer agrees that Mid State's indemnity obligations destroy its payment bond claim. Thus, Mid State's claim against the payment bond and claim to enforce the arbitration award are due to be dismissed as a matter of law.

## 2.    Mid State's payment bond claim is barred because Mid State is a joint venture partner of U.S. Coating.

Mid State's payment bond claim is also barred due to Mid State's status as a joint venturer with U.S. Coating.  Courts have determined that the payment bond surety is <u>not</u> liable for sums expended on a project by a partner or joint venturer of the bonded principal. *Hardaway*

*v. Nat'l. Surety Co.*, 211 U.S. 552 (1909); *Grubb*, 358 F.2d at 512; *Nat'l. State Bank of Newark v. Terminal Const. Corp.*, 217 F. Supp. 341 (D.N.J. 1963); *U.S. ex rel. v. USF&G*, 4 F. Supp. 854 (D. Wyo. 1933).

To determine whether Mid State and U.S. Coating are joint venture partners, Mississippi law provides, "[t]here is no difference between a partnership and a joint venture except the latter has limited and circumscribed boundaries. Indeed, the only purpose in distinguishing a joint venture from a partnership is to define a business relationship which is limited to specified undertakings for profit, rather than a general and continuing business of a particular kind." *Hults v. Tillman*, 480 So. 2d 1134, 1141 (Miss. 1985). The Mississippi Supreme Court has broadly defined a joint venture as:

> An association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have a voice in its management.

*Sample v. Romine*, 8 So. 2d 257 (Miss. 1942).

In a factually similar case, Floyd R. Grubb ("Grubb") was the successful bidder on a contract to relocate a road in connection with a dam project. *U.S. ex rel. Briggs v. Grubb*, 358 F.2d 508, 510 (9th Cir. 1966). Shortly after the project began, Grubb realized he could not perform the contract and enlisted the assistance of J.W. Briggs ("Briggs"), a subcontractor, to complete the project. *Id.* After performing work, Briggs brought a Miller Act claim against the surety pursuant to his subcontract with Grubb and as an assignee of persons who furnished labor or material on the project. *Id.* at 511. In denying Briggs' claim, the Court held the payment bond is not "liable for monies expended on the contract by a partner or joint venturer of the contractor under the bond." *Id.* at 512. The Court based this decision on several facts including Briggs' assumption of payroll, approval of all bills, choice of subcontractors, and Briggs'

knowledge of Grubb's diversion of Project funds.  *Id.*; *see also USF&G*, 4 F. Supp. 854 (Court declined joint venturer's recovery against bond finding joint venture based on establishment of joint account funded by project funds and disbursed by signatures of both parties). Most important was the court's holding that ". . . even if [Briggs] had established that he was a subcontractor he still could not recover." *Id.* at 513.

In the case at bar, there can be no other conclusion than U.S. Coating and Mid State were joint venture partners as established by the agreements and their actions on the Project. First, Mid State provided the bonding through Travelers so that U.S. Coating could obtain the Project. *See* DE #1-7. Mid State paid the $89,000 premium for the Bonds. *See* Exhibit "D" at 39:23 through 40:2.

Mid State and U.S. Coating had an agreement to share profits on the total contract, and Mid State testified that this agreement, though not signed by Mid State, memorialized the agreement to share in profits.  *See* Exhibit "D" at 97:5 through 99:8; *see also* Exhibit "C".  That agreement provides, "[i]n April 2010, [U.S. Coating and Mid State] elected to submit a bid proposal to the U.S. Army Corps of Engineers for the construction of the ERDC/ITL Building in Vicksburg, Mississippi . . . [U.S. Coating] proposed to Mid State that the two firms would prepare a bid for the job and, if awarded, construct the building and share the profits.  [U.S. Coating] submitted the bid as prime contractor.   Mid State, through its relationship with Travelers Surety obtained a bid bond for [U.S. Coating] to submit with their bid." *See* Exhibit "C".  That agreement further provides, "[U.S. Coating and Mid State] have further agreed to execute the work of the Contract in a cooperative manner, each contributing resources and expertise as needed to benefit the profitability of the job . . . the two parties agree to share in the profits of the job." *See* Exhibit "C".  Mid State testified that it had no profit built into its

subcontract work but looked solely to the profits built into the contract between U.S. Coating and the Corps.  *See* Exhibit "E" at 31:2 through 32:12.  Additionally, Mid State listed the entire $13,613,000 prime contract in its financial records.  *See* Exhibit "Q".

As a part of providing a bid, U.S. Coating was required to provide payment and performance bonds in the amount of its bid.  40 U.S.C. §§ 3131 *et seq.*  U.S. Coating could not provide bonds of this size.  Having no experience with a project of this size, Mid State and U.S. Coating entered into an Agreement Regarding Bonding Credit through which Mid State lent U.S. Coating its bonding credit so U.S. Coating could provide payment and performance bonds for the Project.  After entering into this agreement, Mid State had Travelers issue the payment and performance bonds, paid the premium for those bonds, and billed U.S. Coating via Payment Application No. 1 for the bond premium.  *See* DE #1-7. Most important is the fact that Mid State agreed that it, along with U.S. Coating would be liable under the indemnity agreement for losses incurred under the bonds. *See* DE #1-7. In addition to sharing in profits, the parties agreed to share in the losses or liabilities of the Project. Under the Agreement Regarding Bonding Credit, the following provisions lead to a conclusion that Mid State and U.S. Coating were joint venturers:

- Mid State loaned U.S. Coating its bonding capacity so that U.S. Coating could obtain the prime contract for the Project.

- Mid State acknowledged that Travelers provided the Bonds in reliance on the indemnity agreements of Mid State, Ware and Bernheim.

- Mid State had the right to determine whether any claim on the Bonds (i.e. bills of U.S. Coating or any other subcontractor or supplier) should be paid, settled or compromised.

- Mid State had the right to determine whether any claim under the contract with the Corps should be paid, settled or compromised.

- Upon the occurrence of a default, Mid State had the right to, among other things, take possession of the work including U.S. Coating's scope of work) under the contract with the Corps.

{JX020607.1}

- Mid State had the right to take over subcontracts.

- Mid State had the right to take possession of U.S. Coating's property to utilize same to complete the contract without payment for such use.

- Lastly, Mid State had the right to take possession of project funds and use them to complete the Project.

*See* DE #1-6.

On November 19, 2010, Mid State and U.S. Coating entered into the Subcontract giving Mid State the major portions of the work for the Project.  *See* DE #1-4.  Mid State testified that it had no profit built into its subcontract but looked solely to the profits built into the prime contract to share with U.S. Coating. *See* Exhibit "E" at 31:9 through 32:12.

On November 23, 2010, Mid State and U.S. Coating entered into an Escrow Agreement giving Mid State and U.S. Coating access and control over the Project funds.  The relevant terms of the Escrow Agreement include, but are not limited to, the following:

- An acknowledgment that Travelers issued the Bonds in reliance upon the indemnity obligations of Mid State, Ware and Bernheim.

- The Escrow Agreement established an account for the Project funds to be kept separate from other funds of U.S. Coating or Mid State.

- U.S. Coating was to place all proceeds from the Contract into the escrow account to be used for legitimate Project costs.

- Funds in the escrow account were controlled by Mid State and U.S. Coating and could be released by a written document signed by Mid State and U.S. Coating detailing what amounts were to be release and to whom.

*See* DE #1-8.

After the Project started, on February 3, 2011, U.S. Coating and Mid State entered into an Employee Lease Agreement through which Mid State provided a project superintendent and assistant project superintendent to U.S. Coating.  *See* DE #1-5.  Mid State testified that the individuals provided to U.S. Coating were supervised by U.S. Coating's on-site manager and reported directly to Earl Washington with U.S. Coating.  *See* Exhibit "D" at 48:19 through 49:25.

{JX020607.1}

27

In sum, Mid State testified that the terms of the deal were that Mid State would provide the Bonds, Mid State would provide project management, Mid State would provide project accounting, would act as a subcontractor for critical portions of the work, would split profits 50/50, would be liable for losses and claims on the Bonds, and would have access to the Project funds to be disbursed jointly. *See* Exhibit "D" at 37:3-19. These facts more than support the proposition that Mid State and U.S. Coating were joint venture partners. As a joint venturer with U.S. Coating, Mid State falls outside Miller Act coverage and is not entitled to recover under the payment bond. *Hardaway v. Nat'l. Surety Co.*, 211 U.S. 552 (1909); *Grubb*, 358 F.2d 508, 512 (9th Cir. 1966); *Nat'l. State Bank of Newark v. Terminal Const. Corp.*, 217 F. Supp. 341 (D.N.J. 1963); *U.S. ex rel. v. USF&G*, 4 F. Supp. 854 (D. Wyo. 1933).

**3.      Travelers is Entitled to a Credit for Sums Paid to Mid State's Subcontractors and Suppliers.**

Even if the Court determines that Travelers is not entitled to summary judgment dismissing Mid State's payment bond claim and claim to enforce the arbitration award, Travelers is entitled to a credit for sums paid to Mid State's subcontractors and suppliers.

Mid State's payment bond claim and/or claim to enforce the arbitration award includes amounts owed its subcontractors and suppliers. To date, Travelers has paid three (3) payment bond claims to Mid State's subcontractors and suppliers. Those companies were Gipson Steel, a supplier of the structural steel, Birdsong Construction, the dirt works subcontractor, and Adam Evans Waterproofing, a waterproofing subcontractor. *See* Exhibit "E" at 38:1 through 42:8. In total, Travelers has paid $501,051.60 to Gipson Steel, Birdsong Construction, Adam Evans.  *See* Exhibit "J".  These amounts have not been disputed by Mid State and are included in Mid State's $1,225,782.30 Arbitration Award.  *See* Exhibit "E" at 38:1 through 42:8.  Mid State would be unjustly enriched if it were allowed to recover $1,225,782.30, which includes sums due to

Gipson Steel, Birdsong and Adam Evans, without having the obligation to pay $501,051.60 to these subcontractors and suppliers.  If the Court determines that Travelers is not entitled to summary judgment based on the arguments set forth in B.1 and/or 2. *supra*, then Travelers is entitled to a credit of $501,051.60 against the Arbitration Award.

## V.   CONCLUSION

Based on the facts and law set forth above, Travelers requests the Court grant its Motion for Summary Judgment as follows:

1)      That Mid State is jointly and severally liable for Travelers's losses in an amount to be proven at trial.

2)      That Mid State's payment bond claim and claim to enforce the arbitration award against U.S. Coating are due to be dismissed as a matter of law.

3)      That Mid State's defenses for failure to mitigate, breach of the implied duty of good faith and fair dealing, and misrepresentation are due to be struck as a matter of law.

4)      That U.S. Coating and Earl Washington are jointly and severally liable for Travelers's losses in an amount to be proven at trial.

5)      That U.S. Coating and Earl Washington's defense of bad faith is due to be struck as a matter of law.

6)      Alternatively, if the Court determines Travelers is not entitled to summary judgment dismissing Mid State's payment bond claim and claim to enforce the arbitration award, Travelers is entitled to a credit for all sums paid to Mid State's subcontractors and suppliers.

This, the 14th day of June 2013.

Respectfully submitted,

TRAVELERS   CASUALTY   AND   SURETY
COMPANY OF AMERICA

{JX020607.1}

By Its Attorneys,

JONES WALKER L.L.P.

By:   */s Bradford C. Ray*
      Bradford C. Ray

Mark D. Herbert (MSB No. 2370)
Bradford C. Ray (MSB No. 101180)
JONES WALKER L.L.P.
Post Office Box 427
Jackson, Mississippi  39205-0427
Telephone (601) 949-4820
Telecopy (601) 949-4804
mherbert@joneswalker.com
bray@joneswalker.com

## CERTIFICATE OF SERVICE

I, Bradford C. Ray, hereby certify that I electronically filed the foregoing with the Clerk

of Court using the ECF system which sent notification of such filing to:

Ralph B. Germany, Esq.
Bradley Arrant Bolt Cummings LLP
188 E. Capitol Street, Suite 400
Jackson, MS 39201
rgermany@babc.com

Herbert J. Irvin, Esq.
Irvin & Associates
1230 Raymond Rd
Jackson, MS 39204-4583
iq.attys@gmail.com

Mr. Earl Washington
U.S. Coating Specialties & Supplies
P.O. Box 11809
Jackson, MS  39283-1809
Earlwashington@uscoatingspecialties.com

This the 14th day of June 2013.

      */s/  Bradford C. Ray*
      BRADFORD C. RAY

{JX020607.1}