**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES FOR THE USE AND** | ) | |
| **BENEFIT OF MID STATE** | ) | |
| **CONSTRUCTION COMPANY, INC; and** | ) | |
| **MID STATE CONSTRUCTION** | ) | |
| **COMPANY, INC.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No: 5:11-cv-00169-DCB-** |
| | ) | **JMR** |
| **TRAVELERS CASUALTY AND SURETY** | ) | |
| **COMPANY OF AMERICA; U.S.** | ) | |
| **COATING SPECIALTIES & SUPPLIES,** | ) | |
| **LLC; and EARL WASHINGTON** | ) | |
| **Defendants.** | ) | |

---

**MID STATE CONSTRUCTION COMPANY, INC.'S MEMORANDUM IN
SUPPORT OF ITS RESPONSE TO TRAVELERS CAUSUALTY AND SURETY
COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

---

**COMES NOW** Mid State Construction Company, Inc. ("Mid State") and files this

Memorandum in Support of its Response to Travelers Casualty and Surety Company of

America's ("Travelers") Motion for Summary Judgment. [Doc. 121; Doc. 122].

### Introduction

This case arises out of the ERDC Project in Vicksburg, Mississippi for the U.S. Army

Corps of Engineers (the "Corps"), which was an 8(a)/DBE set-aside project. U.S. Coating

Specialties & Supplies, LLC ("US Coating), a certified 8(a)/DBE, obtained the prime contract

for the project. Mid State executed a limited liability rider to US Coating's indemnity agreement

with Travelers regarding the payment and performance bonds for the project issued by

- 1 -

4/376991.1

Travelers.[1] Ex. 1 (¶ 2); Ex. 2.  Mid State held the rights to serve as the major subcontractor on the project, held payment rights under an employee lease agreement, and held rights under various agreements requiring US Coating and its principal (Earl Washington) to have the project funds escrowed to safeguard them. Ex. 1 (¶¶ 1-4); Exs. 3-8.

In the summer of 2011 US Coating (1) stole over a _**$1,000,000**_ owed to Mid State, (2) intentionally diverted project funds from the escrow account, and (3) wrongfully kicked Mid State off the project.  US Coating's actions constituted egregious violations of three different sets of agreements fundamental to the project and the safeguarding of the project funds. Ex. 1 ¶ 5.  After having swindled Mid State, US Coating drove the project into the ground, in the process running up _**additional**_ bond claims.  According to Travelers, US Coating ran up _**another**_ $2,000,000 in claims, for which Travelers now wants payment from Mid State.

Once US Coating began the process of stealing from Mid State, _**Mid State immediately put Travelers on notice and begged for Travelers' help**_.  Mid State told Travelers all about US Coating's outrageous conduct.  Mid State warned Travelers that US Coating must be stopped.  Mid State warned Travelers not to fall for US Coating's schemes.  Mid State begged Travelers to help protect the project _**by getting control of the project funds**_, so that US Coating would be stopped from doing further damage.  Mid State made a claim so that Travelers (as was agreed to by Travelers) could take action against US Coating in light of that bond claim. Ex. 1 ¶¶ 5, 7, 11, 13-15, 20;  Exs. 9-15.  Yet Travelers failed to act appropriately.

---

[1] That limited liability rider is the agreement that Travelers asked Mid State to sign in order to get the payment and performance bonds.  Ex. 1 ¶3; Ex. 123.  That rider controls, _**not**_ Mid State's prior general agreement of indemnity attached to Travelers' motion.  That rider was signed by Mid State alone, not by William Ware or P.G. Bernheim.  Accordingly, the individuals cannot be and are not liable.

Mid State did not act just as a bond claimant in calling on Travelers.  Mid State acted as the party who not only had an indemnity rider with Travelers, but also was the only reliable indemnitor.  Travelers, before getting involved with the project, **_knew_** that US Coating was not reliable and that Mid State's involvement as the major subcontractor with responsibility for most of the work was a key element.  Ex. 16; Ex. 17, pp. 14-16, 36; Ex. 18.  When Mid State made its pleas, Travelers was hearing from the party Travelers knew was the key to the job.

Travelers, as the surety, held a unique position entitling it to get control of the project funds and hence the project. It had special rights as surety to take **_meaningful and effective compulsory action_**.[2]  It could assert stakeholder rights to secure the project funds by having them paid to Travelers.  See *Cincinatti Ins. Co. v. United States*, 71 Fed.Cl 544 (2006), *Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985), and the other authorities cited in Ex. 82 and Ex. 85.  Further, Travelers' indemnity agreement with US Coating provided that the project funds were "trust funds" that Travelers could seize via injunctive relief.  See Exhibit 39 at ¶¶ 3, 5, 15, 17-21.  That Exhibit is Travelers' pleading asserting those rights, but filed many months too late.  Also, Travelers under its indemnity agreement with US Coatintg could seek a court order to take-over the project.  See Exhibit 39 at ¶¶ 5 & 33.[3]

---

[2] Travelers did begin an investigation and did make some demands. However, it failed to take the **_compulsory action_** like that referenced above, which as shown herein was the only appropriate course of action.  Simply put, the facts Travelers was shown by Mid State and the Corps, and that Travelers learned from US Coating's evasive responses (when it bothered to respond at all), all did nothing but demonstrate why Travelers as surety should have in the summer of 2011 exercised its unique **_compulsory_** rights as surety.

[3] Travelers has indicated it may argue that it could not assert these rights until it had actually paid claims. Though *Balboa* and *Cincinatti* reference paid claims, they recognize that the notice could be given just on the basis of asserted or potential claims.  Those two cases also reject the arguments that the FAR provision which purports to limit the surety's rights to only retainage, and the FAR provision which purports to say the government cannot withhold monies due to a subcontractor payment claim, are subordinate to the equitable rules recognized in those cases.  In any event, the trust fund and work takeover provisions in US Coating's indemnity agreement on their face do not require paid claims.  Plus, when Travelers finally acted, it had only paid some $160,000 in claims, as shown

- 3 -

As the above-referenced pleading demonstrates, Travelers did **_eventually_** exercise its unique rights as surety. But it did not do that until February 2012, which was too late. Travelers, the biggest surety company in the nation, should have done that in the summer of 2011, when all the damage could have been avoided. In the summer of 2011 Mid State begged for Travelers' help, but Travelers failed to act appropriately in response. Travelers instead effectively sided with US Coating and Earl Washington, whom Travelers knew were not reliable. Travelers let US Coating and Earl Washington over the next several months do exactly what Mid State in the summer of 2011 warned against – Travelers let them run the project into the ground and run up payment and performance bond claims.

One issue in this case is Mid State's entitlement to payment. Another issue is whether Travelers can force Mid State to pay for the losses run up by US Coating after US Coating wrongfully kicked Mid State off the project and after Travelers knew that US Coating and Earl Washington were diverting funds away from the escrow account.[4] Since Travelers' motion focused on the indemnity issue, Mid State will begin with that issue.

Mid State will show that Travelers lost its indemnity rights against Mid State because Travelers inexcusably failed to take proper actions to mitigate. If Travelers had acted to secure control of the project funds by at least September 21, 2011 (which was almost four full months after Travelers was first put on notice), then there would have been enough in remaining funds to

---

by its pleadings. Over $150,000 of that was Gipson Steel's claim, which existed since July 26, 2011, and, for which as noted herein Travelers had independent responsibility and should have paid back in the summer of 2011 when the materials were delivered. See Exs. 25, 32, 44, and 102 and the other discussion herein regarding Gipson.

[4] US Coating's payment defaults were egregious enough to compel Travelers to act. But US Coating's and Mr. Washington's intentional diversion of the project funds away from the escrow account independently compelled decisive action from Travelers. Both Travelers and Mid State have designated as expert witnesses men who agreed that getting control of project funds is key on any troubled project. Ex. 120 (Ex. A., pp. 4 & 5); Ex. 98, p. 126.

4/376991.1

have allowed Mid State to complete the project at no loss to Travelers. If Travelers had secured

the funds by at least that point, Mid State could have (under the commitments it already had in

hand from subcontractors and suppliers) completed the project for a direct cost of $11,035,857.

At that point the remaining contract funds held by the Corps were $11,625,574.67, which was

$589,717.67 more than needed. This means Mid State could have prevented for the benefit of

everyone all the third party bond claims for which Travelers now seeks indemnity. Ex. 1 ¶6; Ex.

20; Ex. 21; Ex. 22; Ex. 49; Ex. 95.  Yet Travelers failed to *even just help* Mid State in its own

efforts to get control of the project funds and hence the project.[5]

### Factual Summary on the Indemnification Issue

Key facts that show why Travelers should have taken timely and appropriate action (i.e.,

compulsory action to actually seize the funds) include the following:

- When Travelers issued the bonds for the project, Travelers knew that Mid State

was the only reason Travelers was bonding the project, knew that US Coating was not reliable,[6]

and knew it was vital that Mid State serve as the subcontractor actually performing the vast

majority of the work. Ex. 16; Ex. 17, pp. 14-16, 36, 40; Ex. 18.  Travelers failed to help the one

party it found to be reliable.

- Travelers failed to take appropriate action even though it knew that US Coating

was diverting the payments on this $13,613,000 project away from the escrow account where US

---

[5] Ex. 24, pp. 104-6.  As shown herein, Mid State attempted to assert *Travelers'* stakeholder rights and it pursued injunctive relief to have the project funds escrowed, but Travelers failed to timely join in Mid State's efforts.

[6] Travelers' key underwriter witness, Stacy O'Neal was already performing an underwriting review of US Coating for other projects.  Ray Lorah, Mr. O'Neal's boss, had at one point established as precondition to the issuance of the ERDC bonds was that US Coating not have been rejected on other projects at the time the ERDC bonds were issued. Ex. 17, pp. 14-16, 36, 40; Ex. 18.

- 5 -

Coating had promised to escrow them for safeguarding for paying subcontractors bills, and to assure their proper use so that the project could be completed for the contract balance. Ex. 1 ¶4; Ex. 9; Ex. 14.  Travelers knew this beginning in May and June of 2011.

- Travelers failed to take appropriate action even though it knew or should have known that US Coating and Mr. Washington had lied about paying Mid State's $1,000,000 claim.[7]  Ex. 25; Ex. 24 pp. 149-55.[8]  Travelers had identified this key issue before July 26, 2011.

- Travelers failed to take appropriate action even though Travelers knew that US Coating was not even paying sums undisputedly due Mid State.  US Coating challenged only a fraction of Mid State's billings, yet did not pay the undisputed portions.  Ex. 26; Ex. 27. Travelers knows that is classic bad faith conduct.  *Travelers Indem. Co. v. Wetherbee,* 368 So. 2d 829, 834-35 (Miss. 1979).  Travelers was put on notice of this in July 2011.  Ex. 28; Ex. 29.

- Travelers failed to take appropriate action even though US Coating never provided a meaningful explanation for why it was not paying. Travelers itself cannot meaningfully explain how US Coating disputed Mid State's claim, instead being able to only vaguely refer to some alleged overbilling in some undefined amount.  All Travelers' key person handling this claim could testify to was that the information on the alleged dispute was "somewhere" in the un-indexed 90,000 pages of documents produced by Travelers. Ex. 24, pp.

---

[7] Travelers' own documents show that by July 2011 Travelers knew the key fact was whether US Coating had paid Mid State per Mid State's billings.  On July 26, 2011 Travelers emailed confirming ***repeated prior*** conversations where US Coating and Mr. Washington had told Travelers they had paid Mid State.  Ex. 25. So by July 2011 Travelers knew it came down to whether they could produce the checks showing all those payments.

[8] Ms. Ziv-Goldstein's testimony is confusing as to whether she ever got the checks showing payment for April 2011. The bottom line is she did not.  Once again Travelers' 30(b)(6) witness and main claim handler could not testify about one of the key issues in this case.  Mid State was never paid for April. Ex. 1 ¶ 5.  If Ms. Ziv-Goldstein had paid attention to the facts, she would know that.

- 6 -

60-69.  Despite her testimony, her own e-mail confirms she never got any meaningful details, but instead got mere "narratives" from US Coating and Earl Washington.  Ex. 30.

- Travelers failed to take appropriate action even though Travelers knew that US Coating had billed and collected from the Corps for Mid State's work, but still had not paid Mid State. Ex. 9; Ex. 24, pp. 126-128.; Exs. 28 & 29. Travelers was on notice of this in May 2011.

- Travelers failed to take appropriate action even though it knew that US Coating had billed the Corps for other subcontractors/suppliers work, and that US Coating had collected from the Corps under those billings and still did not pay those other subcontractors/suppliers. Ex. 24, p. 95-97.

- Travelers failed to take appropriate action even though Travelers knew that US Coating's actions of billing the Corps and then not paying Mid State and other subcontractors/suppliers constituted a repeated series of violations of the law under the Federal Prompt Payment Act.  Ex. 24, p. 95-97[9]; Ex. 28; Ex. 29; Ex. 32.  Travelers was first put on express written notice of this in July of 2011.

- Travelers failed to take appropriate action even though Travelers was being repeatedly advised by the Corps that US Coating was floundering on the project and not paying its bills.  Ex. 24 pp. 101-03; Exs. 32-37. Travelers was first put on notice of this in June 2011. Travelers' own pleadings confirm those conditions continued unabated into 2012.  Ex. 39 (¶11).

---

[9] Travelers' testimony was that Prompt Payment Act violations go hand-in-hand with payment bond claims – that one necessarily follows from the owner.  Travelers' knowledge about that result demonstrates why Travelers was compelled to act – because it knew those violations were going to lead to payment bond claims.

•       Travelers failed to take appropriate action even after US Coating failed to live up to its commitments in an early August 2011 conference call to escrow all funds with Travelers, instead belatedly months later sending only part of one payment.  Ex. 24 pp. 144-145; Ex. 41-48.

•       Travelers failed to take appropriate action despite the fact US Coating repeatedly hid the ball about critical information (including regarding a books-and-records review) necessary to understand the project, its status, the finances, etc.  Ex. 24, pp. 92.  The whole purpose of the books-and-records review was "to make sure that the payments were going where they were supposed to go and to basically trace the money".  Ex. 204-205.  This game playing continued unabated for months.  In fact, Travelers never got the information from US Coating. Travelers let US  Coating get away with not providing anywhere near the standard required information.  Ex. 42; Ex. 48; Ex. 50, p. 17-18, 20-28.  Travelers let US Coating get away without providing any records related to Mid State's $1,000,000 claim. Ex. 50, pp. 68-69; Ex. 107. Travelers could not even confirm it was reviewing the records for the right company.  The review was supposed to be of US Coating, which again is "U.S. Coating Specialties & Supplies, LLC."  The financial statements Travelers reviewed were for "U.S. Coating Specialties & Suppliers, Inc." Ex. 50, pp. 37-39; Ex. 104.

## **Further Facts**

Mid State has been in business for over fifty years as a well-respected prime contractor. Ex. 17, p.11; Ex. 51.  Mid State, US Coating and Earl Washington had worked together before. US Coating had been a subcontractor to Mid State for flooring coatings and coverings work. That is the kind of work US Coating traditionally did.  Ex. 1 ¶16; Ex. 18.  Before the ERDC project the largest job on which US Coating had served as the prime contractor was an $800,000

job – a far cry from a $13,613,000 project for the Corps to build a multi-story building to house supercomputers.  Ex. 23, p. 18.  Travelers knew or should have known this since it had been underwriting US Coating both generally and in particular for this job.  Ex. 17, pp. 14-36, 36, 40.

As Travelers' own documents confirm, the plan all along for the ERDC project was for Mid State to help US Coating perform the job. Ex. 18.  As noted above, Mid State was to serve as the major subcontractor with a major portion of the total job under its subcontract, including in particular all the key work during the early portion of the project.  This was because that work in the early portions is typically the most critical in terms of staying on schedule, and it was the kind of work with which US Coating did not have any real experience.  Ex. 1 ¶¶16-17.  Further, though Travelers tries to claim that Mid State should have known it was dealing with rouge actors, that was not Mid State's past experience with US Coating and Mr. Washington.  Going in to this Mid State did not question their integrity.  Mid State was shocked to see how US Coating and Mr. Washington acted.  Ex. 1 ¶16; Ex. 52, p. 6.

As noted above, Mid State was to provide indemnity support.  Plus, Mid State was supposed to be the major subcontractor with the major portion of the work.  Also, US Coating had no experience as prime contractor on a job like the ERDC project.  So, Mid State helped US Coating with the bidding, including by putting together a complete bid that it prepared itself. Mid State obtained quotes and pricing for the entire project – not just on the parts that would be under its subcontract, but for all of the work.  That way Mid State would have a good handle on what the entire prime contract price would be before the bid was submitted.  Ex. 1 ¶¶16-17.

Mid State obtained such a global set of prices from subcontractors and suppliers (and the corresponding commitments to work for those prices) and passed that information along to US

- 9 -

Coating.  US Coating took Mid State's numbers and used them in US Coating's bid without modification.  Ex. 1¶¶ 16-17; Ex. 95, pp. 11-16, 42-43, 49.  This means the prime contract was based upon the quotes and prices that Mid State had obtained for the entire project scope.  This means that if Mid State had been allowed to takeover completion of the job (as it was continually requesting), it already had the quotes, prices and commitments from subcontractors and suppliers needed to complete the prime contract.  It is not surprising then that Mid State can show that if Travelers had taken timely action to get control of the project funds and the project, Mid State could have finished the project for the remaining prime contract funds.  Ex. 1 ¶¶ 16-17; Exs. 20-22 & 49.

When US Coating was awarded the job, it became time to have Travelers issue the payment and performance bonds.  At that point it became necessary for US Coating and Mr. Washington to follow through with the oral agreements between themselves and Mid State regarding how the ERDC project would be set up.  One part of that was that they would enter into agreements regarding how to protect the project funds.  Long story short, the project funds were to be sent to an escrow account from which Mid State could veto disbursements.  This would allow Mid State to see that the funds were not improperly diverted.  The first of these agreements was the June 23, 2010 *Agreement Regarding Bonding Credit*.  Ex. 1¶ 4; Ex.  53.

Over the next several months Mid State attempted to get US Coating and Mr. Washington to follow through with all the various agreements and documents needed to actually set up the escrow fund.  Mid State also during that time worked to get executed the subcontract by which Mid State would be the major subcontractor.  What should have been a simple process became an extraordinarily protracted and difficult process because US Coating and Mr.

- 10 -

Washington would not live up to their commitments and used all kinds of alleged excuses to try to justify not following-through.  As part of that they kept trying to say the Corps and the Small Business Administration would not approve certain things in the escrow arrangement documents. In any event, the Subcontract and the various agreements regarding escrow were not executed until ***after*** Mid State had been told that the government had approved them.  We now know (but did not know then) that US Coating and Mr. Washington were lying, because they did not get the government's approval of the documents.  Ex. 1 ¶ 18; Ex. 15; Ex. 52 pp. 34-35; Exs. 54-58.

Once the documents were finally executed, Mid State went to work under its Subcontract and provided supervisors for the job under the Employee Lease Agreement. Ex. 1 ¶18.

Mid State was involved in the billing process with the Corps for the job.  US Coating, Mid State and the Corps would meet and agree on what could be billed for Mid State's work. Mid State then billed US Coating accordingly, and US Coating then added its mark-ups to Mid State's billings and passed them through.  This meant that US Coating billed and collected for Mid State's work without deduction except in a few minor instances.  Ex. 1 ¶6.[10]  Exhibits 61-63 are recaps of the billings and payments which demonstrate the above.

As noted above, the Corps' payments were supposed to go directly into the escrow account.  Except for US Coating's first billing (which did not include work by Mid State), all the payments ***issued*** prior to the two payments issued in May 2011 did go into the escrow account.[11] And just as importantly until May 2011 Mid State was paid for the work it had done under its

---

[10] See Ex. 1 at ¶ 6 for an explanation of the billings.

[11] As explained herein the two payments ***issued*** in May 2011 were for the work done in the months of March and April 2011.

Subcontract. Then in May 2011 US Coating quit putting the project funds into the escrow account and quit paying Mid State. Ex 1 ¶¶ 10-11.

Mid State immediately took action. On May 19, 2011, Mid State wrote US Coating and Mr. Washington demanding that they follow through with their obligations to escrow the project funds. Ex. 64. On May 25, 2011 Mid State filed its demand for arbitration to enforce the escrow documents (seeking both preliminary and final injunctive relief) and to collect the sums owed Mid State. Ex. 65. The agreements between Mid State, US Coating and Mr. Washington required arbitration. See Ex. 3 (article 14.0), Ex. 5 (section 9) and Ex. 6 (section 11).

On May 31, 2011 Mid State wrote US Coating setting out the details as to the diverted funds for the March billings (collected from the Corps on May 3, 2011) and the April billings (collected from the Corps on May 18, 2011). Ex. 9. Mid State also recorded how payment for both of those months' billings ($482,137 for March and $332,700 for April) were now past due, as well as sums owed under the Employee Lease agreement were past due. ***Travelers was copied on that letter***. Ex. 9. Mid State invites the Court's attention to how Travelers was also copied on additional key letters after this date. The record shows that Travelers was either copied on letters, or within a short period of time advised such as via a copy of a follow-up letter.

On June 7, 2011, Mid State put US Coating on notice that if US Coating failed to pay Mid State, then Mid State would stop work on June 14, 2011. Ex. 66.[12] On June 13, 2011 US Coating made an initial payment of part of the amounts owed for March 2011's payment application. US Coating attempted to make certain improper deductions. When Mid State fought back, US Coating yielded, recognizing its error. Ex. 1 ¶11; Ex. 10. However, US Coating still

---

[12] Though Travelers was not copied on the June 7th letter, it was copied on a June 13th letter that warned about the work-stopped. Ex. 10.

refused to pay for April's work, even though US Coating had collected for Mid State's April work back on May 18th. So, Mid State had no choice but to stop work. At that point Mid State had not been paid for April, the project funds (Mid State's and otherwise) were not being escrowed, and Mid State had work for all of May and half of June for which it had not been paid. This was $854,459 of Subcontract work, plus the $160,993.54 in sums owed under the Employee Lease Agreement. Mid State was over a $1,000,000 in the hole with US Coating, could not get paid, could not get funds escrowed, and could not get honest answers. Mid State was however willing to return to work if the defaults were cured. Ex. 1 ¶¶ 5, 7, 11, & 19; Ex. 121.

On June 16, 2011, US Coating wrote threatening to terminate Mid State's Subcontract, with a copy of Travelers. Ex. 67. Of course this was a critical threat. Over and above the fact that US Coating had no grounds for such a termination, everyone knew that Mid State was the key subcontractor with the key work and that US Coating was in no position to finish the job without Mid State. Mid State responded appropriately. This included by amending its Demand for Arbitration. Ex. 1; Ex. 68; Ex. 69 (copied to Travelers).

A couple of days later US Coating acknowledged it was in default. US Coating came to Mid State, acknowledged that it was in over its head, and asked for Mid State to find a way to take-over the job and finish it. Ex. 1 ¶19; Ex. 70. Mid State found a way to structure a deal so that US Coating could turn the job over to Mid State, and Mid State prepared the documentation accordingly. Ex. 71. Mid State sent all of those documents to US Coating for review, but never heard back.[13] Ex. 1 ¶19. Instead, the next response that Mid State got was a notice from US

---

[13] Travelers was not involved in these take-over negotiations. It was however advised of them within about a week their starting. See Ex. 72 (copied to Travelers). Note how that letter also confirmed that US Coating and Earl Washington were diverting the project funds.

Coating that it was default terminating Mid State and kicking it off the project. Ex. 73. That letter was received on July 5, 2011, and Mid State responded appropriately (with copy to Travelers) on the same day. Ex. 121.

The Court should be aware, however, of another key event that occurred just a couple of days before US Coating's wrongful default termination of Mid State. On June 29, 2011 Mid State met with Travelers. Ex. 1 ¶15. At that meeting the US Coating situation was discussed. *Id.* At that meeting Travelers ***agreed*** with Mid State that Mid State needed to file a formal bond claim so that Travelers get involved. On June 30, 2011 Mid State did its part, sending in its bond claim. Ex. 14. To be clear, Mid State's submission of its bond claim was as much as anything for the ***agreed*** purpose of allowing Travelers to get involved and help.

On July 14, 2011 US Coating wrote regarding Mid State's payment application for the work for the month of May 2011. Ex. 27. In that letter US Coating bogusly claimed that it was entitled to certain deductions, purportedly because the Corps had made cuts to certain of Mid State's line items for billings. Note however that even with these ill-founded cuts, US Coating admitted that it owed ***$259,855*** out of the $310,261 for Mid State's May billing. Mid State responded on July 21, 2011. Ex. 28. In its response Mid State showed exactly how each alleged deduction was ill-founded. Mid State warned about the Prompt Payment Act issues raised by US Coating's actions. Mid State copied that letter to Travelers. *Id.*

One week later US Coating responded. Ex. 29 (see US Coating letter as Ex. A thereto). But its response was nothing more than a dodge. Mid State, with copy to Travelers, replied on that same day. Ex. 29. Mid State pointed out US Coating's own project records that refuted US Coating's alleged entitlement to deductions. *Id.* Mid State again pointed out the Prompt Payment

- 14 -

Act issues.  *Id.*  Mid State also expressly pointed out that US Coating was not paying even the

undisputed sums. *Id.*  By the end of July 2011 Mid State had documented to Travelers (using US

Coating's own documents) how US Coating's alleged disputes with Mid State's billings were

bogus, how US Coating was not even paying the undisputed portions of those billings, and how

US Coating was violating federal law with its billings.

  And here is a key point.  By that point Travelers knew US Coating was playing games.

On July 26, 2011, Robbi Ziv-Goldstein – the key claims persons for Travelers – wrote Earl

Washington confirming her ***repeated prior requests*** for copies of the checks that US Coating

"said" had been sent to pay Mid State.  Ex. 25.  By July 2011 Travelers knew it all came down to

whether US Coating could produce checks proving payment – and Travelers surely knew how

producing the checks would be very easy if they actually existed.  By the end of July 2011

Travelers had to know that US Coating was playing games with Mid State's money.  That is

before one considers that by the end of July 2011 Travelers also already knew that it was dealing

with an unreliable actor in US Coating, that US Coating had kicked Mid State (the key

subcontractor) off the job, that US Coating was diverting hundreds of thousands of dollars of

funds away from the escrow account, and that the Corps was hammering on US Coating's

grossly deficient performance on the job.  Yet Travelers still did not take appropriate action.

  Mid State, however, kept at it with real and meaningful action.  In August 2011 Mid State

wrote a series of letter to (and/or copied to) US Coating, the Corps and Travelers.  Mid State

repeatedly pointed out US Coating was not responsible and was in over its head.  Mid State

pointed out US Coating was driving the project into the ground.  Mid State pointed out how US

Coating was grossly inexperienced and how Mid State was critical to finishing the job.  Mid

- 15 -

State pointed out how US Coating was running up bond claims which Mid State demanded be stopped. Exs. 74-76.

Also, on August 1, 2011 Mid State over-nighted to Travelers additional documents further confirming US Coating's and Mr. Washington's egregious misconduct. Mid State warned Travelers about US Coating's and Mr. Washington's tactics. Mid State warned Travelers to not fall for their tactics. Mid State begged for Travelers' help. Ex. 1¶14; Ex. 15; Ex. 77.[14]

On Friday, August 5, 2011 Travelers participated in a conference call with Mid State and US Coating. Ex. 24, p. 205. During that call there were discussions about whether US Coating would escrow the project funds with Travelers. *Id.* This issue came up because US Coating had just been paid additional funds by the Corps. Ex. 78. US Coating's lawyer testified that US Coating agreed to such a voluntary escrow with Travelers but only if terms could be worked out with the Corps to allow for this. Ex. 52, pp.23-25.

Once again Mid State took the lead, drafting the documents for an escrow with Travelers and circulating them on August 9, 2011. Ex. 79. Yet just like the history proved would happen, US Coating failed to even respond. Ex. 1 ¶19. Notably, when Mid State sent those drafts, Mid State again warned against leaving the funds unprotected even with this alleged promise to escrow with Travelers. On August 9, 2011 Mid State called on Travelers to immediately go to the Corps with a demand that the funds be sent to Travelers. Ex. 80.

---

[14] The August 1, 2011 cover letter references that two binders worth of documents were sent, with one binder being comprised almost entirely of the documents that showed the history with US Coating and Mr. Washington. As explained in Ex. 1, Mid State does not attach all of those documents here because it would add to what is already a very large set of exhibits.

As noted above, US Coating contends that the August 5, 2011 voluntary escrow commitment was conditioned on the Corps' approval, while Travelers has seemed to indicate that there was no such expressed condition.  Regardless of whether such a condition existed, no such voluntary escrow arrangements to *secure* the funds (i.e., to keep US Coating from getting them so that it could continue to divert them) would work unless the Corps agreed to send the funds to Travelers. What we know is that on August 8, 2011 the Corps said it ***would not agree*** to participate in such a voluntary escrow arrangement. Ex. 81. So, basically as soon as this voluntary escrow was first discussed, *Travelers knew that it was not going to work-out to actually secure the funds* because the Corps said it was not going to send the funds to Travelers. So when Travelers got Mid State's August 9, 2011 letters, Travelers *already knew* the voluntary escrow arrangements were not going to work.  Yet Travelers still failed to act appropriately.

By August 15, 2011, the funds still were not secured.  As noted above, Travelers had the right to send the Corps a stakeholder letter demanding the funds.  Travelers had not written that stakeholder letter.  So, Mid State wrote the letter itself.  Ex. 82.[15]

Over the next several days there were various additional exchanges between Mid State and the Corps.  Exs. 83-85.  The Corps' repeated response was that since these stakeholder rights belonged to the surety, Travelers, and not Mid State, must write the letter.  Exs. 83 and 84.  Mid State repeatedly wrote Travelers asking Travelers to join in Mid State's letters.  Exs. 86 and 87.

---

[15] Travelers points out how Mid State's August 15, 2011 letter referred to Mid State's indemnity liability.  What Travelers ignores is Mid State's August 22, 2011 (Ex. 122) written after Mid State attempted to assert *Travelers'* stakeholder rights and after Mid State could not get Travelers' simple joinder in that assertion of stakeholder rights as further described in the text above. In that August 22nd letter Mid State expressly asserted its rights to "*pro tanto* discharge and other relief from liability as to the bonds."  So, after Travelers would not even perform the simple act of joining in Mid State's attempts to assert stakeholder rights, Mid State went on record that Travelers' inactions caused loss of Travelers' rights to indemnity. Yet again we have proof that shows Travelers was asleep at the switch. Warnings of loss of indemnity rights could not even draw a reaction.

But Travelers failed to do so.  Ex. 24, pp. 104-06.  In fact, Travelers failed to do so following an August 24, 2011 email from the Corps' attorney that literally laid out the road map for what Travelers should do to assert stakeholder rights.  Ex. 88.  That email invites a written assertion of stakeholder rights specifying the claim amounts so that the Corps would know how much to withhold.[16]  This is particularly true when that email is viewed in the context of all the correspondence the Corps had been sending about US Coating's defaults, which would indicate that the Corps was interested in having a responsible party get control.[17]

All the while, Mid State kept pursuing in the arbitration proceedings injunctive relief to mandate the escrow of the project funds.  Ex. 1 ¶20.  Despite US Coating's and Mr. Washington's delays, an arbitrator was finally appointed and an initial hearing able to be scheduled on August 30, 2011.  The Arbitrator issued a preliminary injunction mandating escrow of the funds.  Ex. 89.  Mid State immediately put Travelers on notice, but Travelers still failed to act, even though US Coating and Mr. Washington refused to comply.  Ex.  89.

---

[16] Travelers own documents show that by August 26, 2011 it had Mid State's claim with an amount of $1,087,000, Gipson Steel's claim with an amount of $435,778, and Birdsong Construction's claim with an amount of $326,973. Ex. 106.  So it had more than enough claims to act.  *See also* Ex. 108.  Moreover, by at least October 13, 2011, it forecast a potential loss of $4,083,900 and still did not act then. Ex. 105.  This is but further indication that Travelers was not paying enough attention to act responsibly.

[17] Travelers has tried all kinds of excuses to say why it has not sent in a stakeholder letter.  Travelers has said that Mr. Robinson told Ms. Ziv-Goldstein back on August 8, 2011 as confirmed by the email of that date, that the Corps would never hold funds under a stakeholder letter.  But that email does not say that, instead addressing only voluntary escrow arrangements under the Anti-Assignment Act.  See Ex. 81. Travelers has also tried to say that the Corps maintained that claims had to not only be received but actually paid before the Corps would withhold funds per a stakeholder letter.  But that is not what the August 24, 2011 email says at all.  Instead, it refers to "possible claims".  See Ex. 88.  Moreover, since that August 24, 2011 e-mail makes no reference to some Anti-Assignment Act prohibition against ever complying with a stakeholder letter, nor any reference to a requirement that claims actually have been paid, the August 24, 2011 e-mail would have to state a new position that would disregard those alleged issues, even if the Corps' lawyer had previously expressed them.

- 18 -

Basically one month after the initial hearing, the final arbitration hearing was held. Following post-hearing briefing, a final award was issued at the end of November 2011, granting Mid State final injunctive relief for full escrow and monetary relief for payment of all sums claimed. Ex. 1 ¶21; Ex. 90. Mid State then filed in this court to enforce the arbitration award (both as to the injunctive relief and the monetary relief), and, put Travelers on notice. Ex. 90. Only then did Travelers bother to take the first step toward asserting stakeholder rights. Ex. 91 and 92. By that point US Coating had returned to work (albeit still deficiently) and the Corps refused Travelers' stakeholder request. Ex. 1 ¶7; Ex. 93. Travelers did not then promptly follow-up with a request for injunctive relief or other court relief. Within a few days US Coating filed for bankruptcy protection, doing so as a result of Mid State's efforts to enforce the arbitration award (both as to the injunctive and monetary relief) in this Court. Ex. 1 ¶21.

Though Travelers claims there was nothing it could have done to get control of this situation like Mid State had requested beginning in the summer of 2011, Traveler finally did exactly what Mid State says Travelers should done in the summer of 2011. In February of 2012 Travelers finally filed to take-over the project and to seize the project funds. Ex. 39 and 40. As a result Travelers in April of 2012 got exactly the relief Travelers should have achieved with mitigating effect in the summer of 2011. Ex. 94.

All the while, Mid State had been and continued begging for the chance to complete the job. Mid State knew that it was the party best situated to complete the project for the lowest price. Ex. 112; Ex. 113. Yet Travelers never gave Mid State that chance. Travelers told Mid State it would have to get its own new bond from *another bonding company* in order to have that chance. Ex. 1 ¶22. That however, was an impossibility with all the outstanding claims on this

- 19 -

project. *Id.*  It was almost patently inappropriate, because as Travelers' own witnesses admitted, Mid State had already once effectively bonded the ERDC job by lending of its bonding credit to US Coating.  Ex. 17, p. 29; Ex. 98, p. 90, 175-76.  Mid State was never given the chance to show how it could have completed the job for less.  This is despite the fact Travelers had standard forms, that it at least at one point was going to use on this project, that would have allowed Mid State to finish the job under the original bonds.  Ex. 96; Ex. 97.

Again, Mid State had commitments from subcontractors and suppliers that were used to develop the original contract sum.  Mid State had the commitments to be able to show that it could have completed the project for a direct cost[18] of $11,035,857, which was $589,717.67 ***less*** than the remaining project funds if Travelers had acted to get control of the project funds by no later than September 21, 2011, which was almost four months after Travelers was first put on notice.  Ex. 1 ¶17; Ex. 20; Ex. 21; Ex. 22; Ex. 49; Ex. 95, pp. 11-16, 42-43, 49.  That is, Mid State could have had $589,717.67 left over to fund satisfaction of the sums owed Mid State or to fund payments to other subcontractors and suppliers.

Further, remember that US Coating simply took Mid State's numbers from its estimate and used them as US Coating's own numbers.  Ex. 95, pp. 11-16, 49. This means that US Coating's cost information would be that secured by Mid State.  The Court should further be aware that Travelers' own construction consultants reviewed that information and concluded that even in late March of 2012 that there were enough in remaining contract funds to complete the

---

[18] Direct costs are the costs incurred on the job.  There are other indirect costs such as home office overhead, which covers things like light bills, phone bills, executive salaries, etc. at the home office.  However, Mid State did not need this job to bear any home office overhead costs.  Mid State survived as a company (i.e., had its home office overhead paid) without getting any additional funds from the ERDC project.  So, Mid State could have finished the ERDC project without needing any additional home office funds from the ERDC project, because Mid State's other jobs and actions were sufficient to cover all those costs.  Ex. 1 ¶17.

project.  Travelers' own construction consultants as late as March 2012 effectively vouched in Mid State's ability to have completed the ERDC project for the then-remaining contract funds. Ex. 116.  The consultants' caveat was that they were concerned about relying upon information from US Coating, because US Coating was not reliable.  What the consultants did not know was that the numbers they were reviewing actually came from Mid State.  Travelers' failure to communicate with and work with Mid State caused further loss.

So, the facts show that the only reason Travelers ended up with the losses it did was because Travelers failed to act timely and appropriately – both in getting control of the project and in giving Mid State a chance to complete.  Instead, what Travelers did was continue to dawdle.  Though it got control of the project in April 2012, Travelers did not secure bids for completion until September of 2012, and did not strike a deal for completion until December of 2012.  Ex. 110 (at 18151 showing that completion contractor payment was not made until December 2012z0; Ex. 114; Ex. 115; Ex. 117.

## Mississippi Law on Sureties' Rights to Indemnity

Travelers contends that Mid State has no defense to indemnity because Travelers has *carte blanche* to pay claims as it sees fit and because Travelers has no duty to mitigate. Travelers contends that in order for Mid State to defeat Travelers' indemnity claims, Mid State must show that Travelers acted fraudulently, or, with a lack of good faith, which according to Travelers requires some kind of super-heightened bad faith conduct.

Travelers cited *Guarantee Co. of North Am. v. Pitts*, 30 So. 758 (Miss. 1901), for the supposed proposition that so long as a surety pays a claim without having committed fraud, then the indemnitor must reimburse the surety for whatever the surety paid.  First, the *Pitts* case's

- 21 -

reference to the word "fraud" was obviously premised on the language of the particular indemnity agreement involved in that case, an agreement which said that the surety's sworn statement was "conclusive evidence (except for fraud)" as to the amounts for which the indemnitor would be liable.  Second, the *Pitts* opinion goes on to state that payments must in any event be made in good faith.  Third, the way that *Pitts* used the terms "good faith" and "fraud" shows that what the *Pitts* Court actually did was construe the word "fraud" (which again was an express term in that case's indemnity agreement) as legally meaning lack of good faith as opposed to truly fraudulent conduct.  *Pitts,* 30 So. at 759.  The Court stated that payments must be made "without fraud – that is, in good faith".  In other words, *Pitts* did not prescribe true fraud as the applicable standard, but instead judicially constructed the contract term of "fraud" as something less than true fraudulent conduct.  So fairly read, *Pitts* does not state the "fraudulent conduct" standard argued by Travelers.

After having cited *Pitts*, Travelers acknowledges lack of fraud is not the sole standard, and that a surety also cannot recover indemnity for losses that are not incurred in good faith.  However, Travelers cites cases from other states to try to convince this Court that a super-heightened standard applies to define the kind of lack of good faith necessary to defeat an indemnity claim.  Travelers cites these other states' cases for the supposed premise that only extraordinarily egregious conduct can serve as a defense, such as for actual ill-motive.

Notably, Travelers relies primarily on cases applying Texas law.  That is a key point, because Texas does not recognize the covenant of good faith and fair dealing as an implied term in a surety indemnity agreement.  *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 282 (Tex. 1998).  Moreover, the Texas Supreme Court in its ruling recognized that

- 22 -

its law therefore diverges from that of other states which require that the surety act in a "reasonable" fashion when addressing claim issues, or suffer a bar against recovery. *Id.* at 285.

Multiple other jurisdictions set a different standard, particularly where those jurisdictions recognize the implied covenant of good faith and fair dealing as applicable to surety agreements. *Hartford v. Tanner,* 910 P.2d 872, 877-81 (Kan. Ct. App. 1996) (covenant of good faith and fair dealing implied in surety agreement and is imposed on every term therein; surety must act with reasonable care; rejected premise that only truly egregious conduct like fraud could be a defense); *City of Portland v. George D. Ward & Assoc., Inc.*, 750 P.2d 171, 174-75 (Ore. Ct. App. 1988) (surety agreements subject to implied covenant of good faith and fair dealing; surety must exercise reasonable care if it wants indemnity; indemnitor not required to show surety acted "for dishonest purposes or improper motives"); *Rush Presbyterian St. Luke's Medical Center v. Safeco Insurance Company of America*, 712 F.Supp. 1344 (N.D. Ill. 1989) (only a showing of negligence is required to defeat indemnity claim); *Hawaiian Ins. & Guar. Co. v. Higashi*, 675 P.2d 767, 769 (Haw. 1984) (surety must act reasonably in order to have indemnity); *Arntz Contr. Co. v. St. Paul Fire & Marine Ins. Co.*, 54 Cal. Rptr.2d 888, 898-99 (Cal. Ct. App. 1996) (surety contracts include implied covenant of good faith and fair dealing; unreasonable conduct defeats indemnity; indemnitor not required to prove surety had evil motive).

Mississippi law falls within the latter group of jurisdictions, not the Texas rule.   In *Perkins v. Thompson*, 551 So. 2d 204 (Miss. 1989), the Mississippi Supreme Court ruled that sureties do not have the *carte blanche* claimed by Travelers.  First, the Court ruled that "[e]very contract, including bond indemnity contracts, has implied covenants of good faith and fair dealing".  *Id.* at 209.  Second, the Court ruled that in order to recover indemnity the surety must

- 23 -

show that its expenditures were "reasonable", "necessary" and incurred "in good faith". *Id.* at 209. *Perkins'* requirements of fairness, reasonableness and necessity set a standard that is a far cry from Travelers' Texas law standard that would redress only fraud and heightened bad faith conduct. Instead, *Perkins* fits squarely with the approach taken by Kansas, Oregon and the other states noted above. In *Perkins*, the indemnity clause contained a broad indemnity clause substantively the same as the one involved here. In *Perkins*, the indemnification clause obligated the indemnitor as follows:

> To completely indemnify the company from and against any liability, loss, cost, attorney's fees and expenses whatsoever which the company shall at any time sustain as surety or by reason of having been surety on this bond or any other bond issued for applicant, or for the enforcement of this agreement.

*Perkins*, 551 So. 2d at 209. Notwithstanding the breadth of that language, the Mississippi Supreme Court ruled that the "proper construction of the clause" would be to require the indemnitor to pay only the expenses fairly and reasonably incurred. *Id.* at 210.

Further, in *Horne v. State Building Comm'n*, 103 So. 2d 373 (Miss. 1958), the Mississippi Supreme Court further interpreted both *Pitts* and a surety indemnity agreement. In *Horne*, the indemnitor claimed that the trial court improperly charged it with certain expenditures, but the Mississippi Supreme Court affirmed the trial court's decision that those expenses were chargeable against the indemnitor. Importantly though, the surety challenged the trial court's ruling that the indemnitor was not liable for certain other charges because they were not reasonably or properly incurred. The trial court found that certain material invoices were not properly chargeable to the job, that the surety had failed to promptly settle certain claims (thereby needlessly incurring interest and attorneys' fees), and that the surety had performed

- 24 -

some repair work that was not the contractor's responsibility under the contract.  The Mississippi Supreme Court made no reference that these expenditures for which indemnity was denied resulted from fraud, ill-motive or some other super-heightened misconduct.  Instead, the opinion shows they simply were not generally proper, i.e., not necessarily or reasonably incurred, and the Mississippi Supreme Court ruled that the surety could not recover for those expenditures.

So, *Pitts'* rulings as to a requirement of good faith, *Perkins'* requirement as to fairness and reasonableness, and *Horne's* review of the basic underlying propriety of expenditures, all confirm that Mississippi law ***does not*** require that the indemnitor pay the bill unless the indemnitor can show actual fraud or ill-motive.  Instead, these Mississippi decisions show that Mississippi fits with those states that allow sureties to recover only when they act reasonably, when they act fairly, and when they mitigate as appropriate.

Further, these standards fit with the law of multiple other states.  *See Heirn v. St. Paul-Mercury Indemnity Co.*, 262 F.2d 526, 528 (5th Cir. 1959) (surety could not recover indemnity if it allowed contractor to continue on after knowledge contractor was diverting funds; court also noting potential defense due to surety's failure to take action to preserve assets); *New Amsterdam Cas. Co. v. Lundquist*, 198 N.W.2d 543 (Minn. 1972) (failure to act after knowledge of improper conduct can cause discharge and can even constitute bad faith or fraud); *United States Fidelity & Guaranty Co. v. Putfark,* 158 So. 9, 10 (La. 1934) ("any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor").  And there can be no question that Travelers had a duty to act.  First, the implied covenant of good faith and fair dealing imposed such a duty.  *Ferrara v. Walters*, 919 So. 2d 876, 883-84 (Miss. 2006) (once notified of problem, defendant duty bound to take steps to cure

- 25 -

problem).  "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with the justified expectations of the other party…. The covenant … may … impose a duty to take some affirmative steps to cooperate." *Id.* at 883. Second, under Mississippi law everyone has a duty to mitigate, and one cannot recover damages he could have reasonably avoided. *Travelers Indemnity Co. v. Rawson,* 222 So. 2d 131, 135 (Miss. 1969)

The above facts and law show that Travelers has lost its rights to indemnity.  It failed to act fairly, reasonably, in good faith and to mitigate.  Summary judgment must therefore be denied.[19]

For the reasons noted above, Travelers is wrong to argue that the settlement authority provisions of Sections 3 and 4 of the indemnity agreement (see Exhibit "B" to Travelers' motion) vest Travelers with essentially unreviewable authority to do what it pleases.  Moreover, note the above assumes that Travelers' actions at issue in this case are in fact governed by those two provisions.  To be clear, Travelers' argument about the requirements for fraud and truly egregious conduct is based upon the premise that those two provisions apply to the factual issues in this case.  That, however, is not a sustainable premise.

Those two provisions deal with how Travelers reacts to a "claim, demand or suit".  On their face they would only address how Travelers handles a damage issue once it has accrued. They do not on their face address Travelers' duties to take action to prevent ***additional*** "claims, demands or suits" from arising, i.e., they do not purport to address whether Travelers has a duty to mitigate to keep new claims from arising.  They merely deal with settlement authority once

---

[19] This particular-facts-of-the-case based standard should not be objectionable to Travelers.  Travelers designated Thomas Caldwell as its purported expert on what Travelers should and should have not have been expected to do. Mr. Caldwell testified that what a surety should and should not do depends upon the particular facts of the matter at hand.  Ex. 98, pp. 17, 18, 57-60, 65, 77.

the problem has accrued.  Those provisions must be construed against Travelers, who drafted them. *Architex Association, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1157 (Miss. 2010). Travelers is not even entitled to argue that it gets special protection under those provisions of the indemnity agreement from the obligations everyone has to act reasonably and to mitigate.

### Travelers Cannot Recover for the Sums Paid to Other Subcontractors

Travelers seeks indemnification for the sums paid Mid State's sub-subcontractors and suppliers, who were Birdsong Construction and Adam Evans Waterproofing.  Travelers says it paid Birdsong $336,973.60 and Adam Evans $11,400.  Those, however, are losses Travelers incurred needlessly.[20]

First, as noted above, if Travelers had acted timely Mid State could have out of the remaining project funds secured $589,717.67 over and above direct costs to complete.  That means Mid State could have secured enough to pay both Birdsong and Adam Evans.  Travelers' failure to timely act caused the loss of those available funds, so under the cases and facts shown above Travelers must bear the consequences of letting those funds be lost.

Second, Travelers had superior knowledge about another $663,000 in project funds US Coating had stashed in a Capital One account. Ex. 50, p. 40; Ex. 99. Travelers obtained from US Coating in October 2011 inside information about the exact account number and the amount of the funds there, and did nothing to secure those project funds.  That is another $663,000 that Travelers allowed to be lost.  Travelers could have secured those funds and used them to pay

---

[20] Though Travelers tries to claim that Gipson Steel was also a Mid State subcontractor/supplier, that is not correct. Ex. 1 ¶24.  Gipson did not deliver materials until US Coating arranged for the materials' delivery, based upon representations that arrangements had been made with the Corps and/or Travelers for a joint check, escrowed funds from Travelers, etc., which did not occur.  Travelers knew those arrangements had not been completed, but did not advise Gipson.  That resulted in Gipson delivering without secured funds for payment. Exs. 25, 44, 100 & 102. Travelers should have secured the funds before it let Gipson Steel deliver, and must bear the loss of having failed to do so.  Moreover, Gipson still could have been paid out of the $589,7171.67 and/or the $663,000 referenced above.

Birdsong, Adam Evans and Gipson Steel, and still had money left over.  Yet Travelers not only did not secure those funds, it did not tell Mid State about their existence, much less the key information about the actual account where they were being held.  Between the two fund sources, Travelers let over a $1,000,000 be dissipated.

Third, Mid State's subcontracts with Birdsong and Evans contained pay-if-paid clauses. See Section 6 of the Standard Terms and Conditions in Exs. 118 & 119.  Those clauses provided that Mid State did not have to pay Birdsong or Evans unless US Coating had paid Mid State.  US Coating has not paid Mid State. The Mississippi Supreme Court has ruled that pay-if-paid clauses are enforceable. *Aladdin Construction Co., Inc. v. John Hancock Mutual Life Ins. Co.*, 914 So. 2d 169 (Miss. 2005)(fn. 11 recognizing enforceability of pay-if-paid language as effective to preclude entitlement to legal relief).  Travelers' liability as surety was dependent upon Mid State first being liable Birdsong and Evans.  40 U.S.C. § 3133(b)(1) (claimants entitled to judgment only for amounts "due").  Since Mid State has not been paid, the debts were not due, and so Travelers should not have paid. *BMD Contractors, Inc. v. Fidelity Deposit Company of Maryland*, 679 F.3d 643 (7th Cir. 2012).

Regarding the other subcontractors' payment bond claims, Travelers needlessly incurred those losses as a result of its failure to act, and for the reasons set above its indemnity claims are barred.  As Travelers itself admits, in the near term after Mid State was run off the job the bond claims only came from subcontractors who had worked for Mid State.  See page 7 of Travelers' memorandum brief and paragraph 3 of Exhibit J to same.  This is because Mid State had essentially all the early work of the in its subcontract, and, US Coating did not recommence work until September 2011. Ex. 1 ¶7.  So, timely action by Travelers to seize the funds and get control

- 28 -

of the project would have meant control before those claims arose.  Or at least if the over

$1,000,000 in funds had been safeguarded as referenced above, there would have been a way to

see that the subcontractors were paid.

As to the $1,000,000 paid to the Corps under the performance bond claim, the same is

even more true.  Again, Mid State could have finished the job for the contract balances if

Travelers had just acted timely.  Mid State's estimate shows that September 21, 2011 would be

soon enough.  Travelers' own consultants' documents confirm that March of 2012 would have

been soon enough.  Yet Travelers not only failed to ever act timely, it never even gave Mid State

the chance to complete the job.[21]

### Mid State Did More Than Enough

Travelers has indicated that it will argue that Mid State did not do enough to protect itself

and/or the project funds.  Any arguments by Travelers in that regard fail.

Travelers has indicated it will contend that Mid State should have gone ***to court*** for an

injunction as opposed to pursuing relief in arbitration. What Travelers ignores is that Mid State's

agreements with US Coating mandated arbitration, as noted above.  That means if Mid State had

attempted to go to court, US Coating could have defeated the injunction request by simply

asserting arbitration and thereby having the Court stay out of it.  9 U.S.C. § 1-4.

Further, when Mid State obtained its preliminary injunction in arbitration on August 30,

2011, that preliminary injunction was short-lived. By its terms, it would last no longer than a

month because it was set to automatically expire the day the final hearing began on October 3,

2011. Ex. 89.  Moreover, the first preliminary injunction provided that US Coating and Mr.

---

[21] Travelers' failure to act as noted above also caused its attorneys' fees, costs and expenses, and for the same reasons those claims are barred.

- 29 -

Washington had the chance in a mere 13 days to have the preliminary injunction set aside. *Id.* So, by going to court for enforcement of the arbitrator's preliminary injunction, Mid State could have found its injunction expired by the time it got a court hearing.  Also, since that arbitration injunction was not final, it was not subject to enforcement in court. *Zephryos Maritime Agencies, Inc. v. Mexicana De Cobre, S.A.,* 662 F. Supp. 892, 894 (S.D.N.Y. 1987).   Further, since proceeding in court is many times deemed a waiver of the right to arbitration, Mid State could have also lost its right to stay in arbitration.  *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1159-62 (5th Cir. 1986).  So, jumping to court could have meant that Mid State would have found itself attempting to enforce a preliminary arbitration injunction at the time that injunction expired, and/or have been told that the injunction could not be enforced because it was not final, and then have lost the benefit of the expedited final hearing schedule provided for in the arbitration proceedings.  Travelers' second-guessing that Mid State should have gone to court is ill-founded.

To be sure, Travelers' argument that Mid State should have sought its injunction in Court is nothing more than after-the-fact attempt at second-guessing.  Travelers never raised this issue at the time in question.  Ex. 1 ¶13.  Also, the facts about the time in question further prove that Travelers is engaged in after-the-fact second-guessing.  Preliminary injunctions require a bond. M.R.C.P. 65(c); F.R.C.P. 65(c).  That means Mid State would have needed a bond sufficient to cover the seizure of over $11,000,000 in project funds, which was the remaining contract balance at that time.  That would mean a bond in the $11,000,000 range.  Travelers was Mid State's bonding company at the time.  Ex. 1 ¶22.  Travelers is emphatic that Mid State could not get any $11,000,000 bonds at that time.  Ex. 17, pp. 42-43.  So, even if Mid State had been able to secure

court approval for a preliminary injunction, Mid State could not get the bond it needed to have the injunction actually issued.  Mid State's only course of action was to remain in arbitration under its expedited hearing schedule so that it could get its final injunction (which would not require a bond) as soon as possible.

Travelers has indicated it may claim that Mid State should have exercised the provisions of the *Amended and Restated Agreement Regarding Bonding Credit* to take-over the job.  What Travelers ignores is that those provisions were expressly rejected by the Corps.  Ex. 1 ¶8; Ex. 103.[22]  This means that under section 11 of that *Amended and Restated Agreement Regarding Bonding Credit* those take-over provisions were effectively deemed omitted.  But even if they had not been, those rights had been rejected by the Corps.  As Travelers acknowledges, no one can unilaterally walk onto a federal project and tell the Corps they are taking over.  Ex. 98, p. 143.  Instead, such a takeover must involve the surety. See Federal Acquisition Regulation 49.404 (48 C.F.R. § 49.404).

Travelers has indicated it may claim that Mid State should have done more to secure the project funds. Mid State did all that it could.  The Anti-Assignment Act restricts the enforceability of *voluntary* assignments on Corps jobs.  31 U.S.C. § 3727; 41 U.S.C. § 15.  The only assignments the Corps must recognize are those that go to a financial institution as part of construction financing for the project.[23]  *Mercantile Nat'l Bank at Dallas v. U.S.,* 280 F.2d 832 (Ct.Cl. 700).  This left only three options to secure the project funds.

---

[22] Mid State did not get Ex. 103 until the summer of 2011 in response to a FOIA request. That letter went to US Coating originally, and US Coating did not share it with Mid State. Ex. 1 ¶8

[23] Some courts have held an extension of surety credit does not qualify.  *General Casualty Co. v. Second National Bank of Houston*, 178 F.2d 679 (5th Cir. 1949).  So, Mid State's lending of bonding credit arguably did not qualify for *mandatory* recognition by the Corps.

- 31 -

The first option was to get US Coating to follow through with the *perfection* of a voluntary assignment by having the Corps *actually accept it*.[24]  Mid State tried to do that, but US Coating kept refusing to follow-through and ultimately it actively interfered.  The second option was to have the surety assert its stakeholder rights.  As shown above Mid State tried that, could not exercise them because it was not the surety, and could never get Travelers to timely cooperate.  The third option is to get a court order. *Keydata v. U.S.*, 504 F.2d 1115 (Cl.Ct. 1974).  As shown above, Mid State did all that it could do there too, consistent with the arbitration terms of  its agreements with US Coating and the related factual issues noted above.

The bottom line is this.  Mid State stands ready to at trial compare what it did against what Travelers did and did not do. Mid State aggressively pursued relief, and in particular compulsory relief, once US Coating stopped paying and started diverting funds in May of 2011.  Travelers did not take the first compulsory act until six months later, and then did not take the meaningful compulsory action until February of 2012.

### Mid State is a True Subcontractor and Holds a Valid Bond Claim

Travelers tries to claim that Mid State was not a true subcontractor, but instead was in a joint venture or partnership with US Coating.  In making that argument, Travelers ignores US Coating's and Mid State's actual intent and agreement, because the parties are unequivocal it was not a joint venture.  Ex. 1 ¶26; Ex. 23, p. 27.  The parties' intent is the most critical factor.  *Hults v. Tillman,* 480 So. 2d 1134, 1143 (Miss. 1985) (joint venture can only exist per an agreement for one to exist; "actual intent to form a joint venture is essential … an agreement to

---

[24] If the Corps had ever chosen to accept the assignment, it would have been enforceable under the waiver principle. *Liberty Ammunition, Inc. v. United States*, 101 Fed.Cl. 581 (2011).  Mid State at one point thought it had the Corps' concurrence in accepting an assignment, but US Coating then objected, so the Corps refused to follow through, and therefore Mid State was denied the Corps' acceptance as a protection. Ex. 1 ¶12.

- 32 -

share in profits and losses is not alone sufficient"). Further, the parties acted under a subcontractor and prime contractor relationship, not as joint venturers or partners. There was no shared control. If there had been, we would not have this case. Ex. 1 ¶ 26; *Hults*, 480 So. 2d 1144 (parties' actual actions are key to whether there is a joint venture).

The relationship was nothing more than what was disclosed to Travelers without objection. Ex. 18 (noting that Mid State would be the major subcontractor with most of the work). In fact, Travelers approved that relationship. *Id.* Mid State was to be a subcontractor and the major subcontractor. Yes, the parties did agree to share the profits; however, there was no agreement to share in the losses. Ex. 1 ¶26; Ex. C to Travelers' motion. *Hults*, 480 So. 2d at 1146 (sharing of losses/liabilities must exist in order for there to be a joint venture). Finally, the documents that purported to give Mid State certain "control" rights essentially purported to do no more than give Mid State the same kinds of rights that Travelers had under its general agreement of indemnity with US Coating. See Ex. B. to Travelers' motion and compare it to the rights granted Mid State under its various escrow agreements. They are as a practical matter no different. This makes its inescapable that the *intent* of those rights was to try to give Mid State opportunities to protect itself as to the surety-type risk it was potentially facing by lending its bonding credit, i.e., to give it surety rights, not joint venturer rights. Again, per *Hults*, the intent is the key.[25]

---

[25] Regarding the *Hardaway v. National Surety Company* case cited by Travelers, the party there proven to be a joint venture actually took-over the entire job, 29 S.Ct. 202 (1909). Obviously that never happened here. Further, a key fact there was that Hardaway was to get no compensation as a subcontractor, but instead was only to be paid out of the receipts from the owner, which again obviously was not the case here. Much the same applies to distinguish this case from that *U.S. ex rel. Briggs v. Grubb,* 358 F.2d 508 (9th Cir. 1966). There a complete takeover of all job responsibilities occurred. Instead of being leased (as was done here), employees were transferred on the actual payroll. Further, the joint venture controlled who would be subcontractors, while here Mid State merely made potential subcontractors available, without mandating their use. Likewise, in *U.S. ex rel. Walker v. United States*

- 33 -

Mid State did lease employees to US Coating, but as noted it was under an express written lease. Ex. 1 ¶26. This was not some subterfuge employee sharing. Mid State did not act as a prime contractor. It managed only its subcontract work. It did not direct the work of other subcontractors. It did not run the meetings with Corps of control the billings to the Corps. Its participation in the billing process as a subcontractor was typical with normal construction processes. *Id.*

Further, Travelers is estopped to deny that Mid State is entitled to a bond claim. Travelers wanted Mid State to have the major subcontractor role which it now attempts to convert into something improper. Ex. 18. Further, Travelers' asserted stakeholder rights against the Corps using Mid State's payment bond claim, went to Bankruptcy Court to seize the funds and takeover the Project using Mid State's payment bond claim as the lead claim, and obtained a Court order granting it that relief. At that time, Travelers already knew the facts and about this alleged joint venture defense – yet Travelers still believed it entirely appropriate to represent to the Corps and the Court that Mid State had a bond legitimate bond – in fact, that Mid State had a bond claim legitimate enough to use as the lead claim. Ex. 39, ¶8. Having repeatedly sought and obtained the benefits of Mid State not being a joint venture and of Mid State having a legitimate bond claim, Travelers is estopped to contend that Mid State was a joint venture and to deny that Mid State has a valid bond claim. *Bailey v. Estate of Kemp,* 955 So. 2d 777, 782 (Miss. 2007); *T.C.B. Const. Co., Inc. v. W.C. Fore Trucking, Inc.,* 2012 WL 2106368 (Miss. Ct. App. 2012) (rev'd only on punitive damages issue).

---

*Fidelity & Guaranty Co.,* 4 F. Supp. 854 (D. Wyo. 1933), the joint account was set up, and the party found to be a joint venture actually kept the books and printed the checks (which did not happen here) and the checks listed both parties as joint contractors (which did not happen here). Simply put, the facts of these cases are each distinguishable, and as all the decisions note, it is the facts of each case that are controlling.

Travelers also claims that Mid State cannot bring a bond claim because it was an indemnitor and therefore the circle-of-indemnity precludes Mid State from recovery. For the same reasons just noted, Travelers is estopped to contend same. Moreover, with its circle-of-indemnity argument, Travelers skips past the critical point. The critical point is whether Mid State still has indemnity obligations. As shown above, Travelers has forfeited its rights to indemnity. As shown above, if Travelers had acted properly, not only would all the other losses have been avoided, but further $589,717 plus another $663,000 could have been safeguarded. That would have been enough to cover Mid State's bond claim, which would have then let Mid State satisfy the claims of Birdsong and Evans.[26] As shown above, none of the other claims could be Mid State's responsibility.

**RESPECTFULLY SUBMITTED**, on July 5, 2013.

**MID STATE CONSTRUCTION COMPANY, INC.**

By: */s/ Ralph B. Germany, Jr.*
Ralph B. Germany, Jr., MBN 8640
rgermany@babc.com
Direct Dial: 601-592-9963
Direct Fax:  601-592-1463
P.O. Box 1789
Jackson, MS 39215-1789

<u>**OF COUNSEL:**</u>
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 East Capitol Street, Suite 400
Jackson, MS 39201

---

[26] Mid State's bond claim included the base claim amounts for Birdsong and for Adam Evans, so, subject to the pay-if-paid and wasting-of-funds issues above, they would otherwise be appropriate for offset against Mid State's claim. As shown above Gipson Steel's delivery was not per Mid State's arrangements, but instead per arrangements made by Travelers and/or US Coating, and hence offset there is not appropriate.  Further, though Travelers refers to 32 bond claims having been filed, Travelers admits there is no liability on those not paid. Ex. 24, pp. 168-80.

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned Ralph B. Germany, Jr., hereby certify that I have served the above and foregoing on all counsel of record via filing with the Court's electronic filing system.  And have served the document on Earl Washington and US Coating:

<u>Via E-Mail and U.S. Mail</u>
Mr. Earl Washington, Individually and as
President/CEO for
U.S. Coating Specialties & Supplies, LLC
125 W. Mayes Street
Jackson, MS
earlwashington@uscoatingspecialties.com

/s/ Ralph B. Germany, Jr.
Ralph B. Germany, Jr.

- 36 -

4/376991.1