**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES FOR THE USE AND BENEFIT OF MID STATE CONSTRUCTION COMPANY, INC; and MID STATE CONSTRUCTION COMPANY, INC.,** | ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No: 5:11-cv-00169-DCB-** |
| **v.** | ) | **JMR** |
| | ) | |
| **TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; U.S. COATING SPECIALTIES & SUPPLIES, LLC; and EARL WASHINGTON** | ) ) ) ) | |
| | ) | |
| **Defendants.** | | |

---

**MID STATE CONSTRUCTION COMPANY, INC.'S MEMORANDUM IN SUPPORT OF ITS RESPONSE TO TRAVELERS CAUSUALTY AND SURETY COMPANY OF AMERICA'S MOTION FOR PRELIMINARY INJUNCTION**

---

**COMES NOW** Mid State Construction Company, Inc. ("Mid State") and files this Memorandum in Support of its Response to Travelers Casualty and Surety Company of America's ("Travelers") Motion for Preliminary Injunction. [Doc. 125; Doc. 126].

<u>**Introduction**</u>

Travelers motion for preliminary injunction involves significant overlap with Travelers' motion for summary judgment. In Mid State's brief in response to Travelers' motion for summary judgment, Mid State set out the key facts and case law related to this lawsuit, and in doing so showed why Travelers is not entitled to summary judgment. Mid State's response to Travelers' motion for a preliminary injunction involves much of the same key facts, so Mid State

- 1 -

in its record citations herein refers to documents attached to Mid State's summary judgment response [Doc. 132] and does not separately attach them hereto.

Since Mid State is not sure that the two motions will be considered simultaneously by the Court, Mid State sets out herein much of what is already addressed in the summary judgment response, to be sure that the Court when reviewing the preliminary injunction issue has the appropriate information. Accordingly, if the Court considers together Travelers' motion for summary judgment and Travelers' motion for preliminary injunction, Mid State advises the Court that it will find pages 1-27 herein are duplicative of Mid State's summary judgment response.   Mid State notes that so the Court can use its time accordingly.

### Facts

This case arises out of the ERDC Project in Vicksburg, Mississippi for the U.S. Army Corps of Engineers (the "Corps").   U.S. Coating Specialties & Supplies, LLC ("US Coating") obtained the prime contract for the project.   Mid State executed a limited liability rider to US Coating's indemnity agreement with Travelers regarding the payment and performance bonds for the project issued by Travelers.[1] Doc. 132-1 (¶ 2); Doc. 132-2.  Mid State held the rights to serve as the major subcontractor on the project, held payment rights under an employee lease agreement, and held rights under various agreements requiring US Coating and its principal (Earl Washington) to have the project funds escrowed to safeguard them. Doc. 132-1 (¶¶ 1-4); Doc 132-3; Doc. 132-4; Doc 132-4; Doc. 132-5; Doc. 132-6; Doc. 132-7; Doc. 132-8.

---

[1] That limited liability rider is the agreement that Travelers asked Mid State to sign in order to get the payment and performance bonds.  Doc. 132-1 (¶3); Doc. 132-123.  That rider controls, **_not_** Mid State's prior general agreement of indemnity attached to Travelers' motion.  That rider was signed by Mid State alone, not by William Ware or P.G. Bernheim.  Accordingly, the individuals cannot be and are not liable.

4/376992.1

In the summer of 2011 US Coating (1) stole over a $1,000,000 owed to Mid State, (2) intentionally diverted project funds from the escrow account, and (3) wrongfully kicked Mid State off the project.  US Coating's actions constituted egregious violations of three different sets of agreements fundamental to the project and the safeguarding of the project funds. Doc. 132-1 (¶ 5). After having swindled Mid State, US Coating drove the project into the ground, in the process running up additional bond claims.  According to Travelers, US Coating ran up another $2,000,000 in claims, for which Travelers now wants payment from Mid State.

Once US Coating began the process of stealing from Mid State, Mid State immediately put Travelers on notice and begged for Travelers' help.  Mid State told Travelers all about US Coating's outrageous conduct.  Mid State warned Travelers that US Coating must be stopped. Mid State warned Travelers not to fall for US Coating's schemes.  Mid State begged Travelers to help protect the project by getting control of the project funds, so that US Coating would be stopped from doing further damage.  Mid State made a claim so that Travelers (as was agreed to by Travelers) could take action against US Coating in light of that bond claim.  Doc. 132-1 (¶¶ 5, 7, 11, 13-15, 20);  Doc. 132-9; Doc. 132-10; Doc. 132-11; Doc. 132-12; Doc. 132-13; Doc. 132-14; Doc. 132-15.  Yet Travelers failed to act appropriately.

Mid State did not act just as a bond claimant in calling on Travelers.  Mid State acted as the party who not only had an indemnity rider with Travelers, but also was the only reliable indemnitor.  Travelers, before getting involved with the project, ___*knew*___ that US Coating was not reliable and that Mid State's involvement as the major subcontractor with responsibility for most of the work was a key element.  Doc. 132-16; Doc. 132-17, pp. 14-16, 36; Doc. 132-18.  When

Mid State made its pleas, Travelers was hearing from the party Travelers knew was the key to the job.

Travelers, as the surety, held a unique position entitling it to get control of the project funds and hence the project. It had special rights as surety to take **_meaningful and effective compulsory action_**.[2]  It could assert stakeholder rights to secure the project funds by having them paid to Travelers.  See *Cincinatti Ins. Co. v. United States*, 71 Fed.Cl 544 (2006) and *Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985).  Further, Travelers' indemnity agreement with US Coating provided that the project funds were "trust funds" Travelers could seize via injunctive relief. See Doc. 132-39 (¶¶ 3, 5, 15, 17-21).  That Exhibit is Travelers' pleading asserting those rights, but filed many months too late. Also, Travelers under its indemnity agreement with US Coatintg could seek a court order to take-over the project.  See Doc. 132-39 (¶¶ 5 & 33).[3]

As the above-referenced pleading demonstrates, Travelers did **_eventually_** exercise its unique rights as surety.   But it did not do that until February 2012, which was too late. Travelers, the biggest surety company in the nation, should have done that in the summer of 2011, when all the damage could have been avoided.  In the summer of 2011 Mid State begged

---

[2] Travelers did begin an investigation and did make some demands. However, it failed to take the **_compulsory action_** like that referenced above, which as shown herein was the only appropriate course of action.

[3] Travelers has indicated it may argue that it could not assert these rights until it had actually paid claims. Though *Balboa* and *Cincinatti* reference paid claims, they recognize that the notice could be given just on the basis of asserted or potential claims.  Those two cases also reject the arguments that the FAR provision which purports to limit the surety's rights to only retainage, and the FAR provision which purports to say the government cannot withhold monies due to a subcontractor payment claim, are subordinate to the equitable rules recognized in those cases.  In any event, the trust fund and work takeover provisions in US Coating's indemnity agreement on their face do not require paid claims.  Plus, when Travelers finally acted, it had only paid some $160,000 in claims, as shown by its pleadings.  Over $150,000 of that was Gipson Steel's claim, which existed since July 26, 2011, and, for which as noted herein Travelers had independent responsibility and should have paid back in the summer of 2011 when the materials were delivered.  See Doc. 132-25, Doc. 132-32, Doc. 132-44, and Doc. 132-102 and the other discussion herein regarding Gipson.

for Travelers' help, but Travelers failed to act appropriately in response. Travelers let US Coating and Earl Washington over the next several months do exactly what Mid State in the summer of 2011 warned against – Travelers let them run the project into the ground and run up payment and performance bond claims.

A key issue in this case is whether Travelers can force Mid State to pay for the losses run up by US Coating after US Coating wrongfully kicked Mid State off the project and after Travelers knew that US Coating and Earl Washington were diverting funds away from the escrow account.[4]  Mid State will show that Travelers lost its indemnity rights against Mid State because Travelers inexcusably failed to take proper actions to mitigate.  If Travelers had acted to secure control of the project funds by at least September 21, 2011 (which was almost four full months after Travelers was first put on notice), then there would have been enough in remaining funds to have allowed Mid State to complete the project at no loss to Travelers.  Mid State could have (under the commitments already in hand from subcontractors and suppliers) completed the project for a direct cost of $11,035,857.  At that point the remaining contract funds held by the Corps were $11,625,574.67, which was $589,717.67 more than needed. This means Mid State could have prevented for the benefit of everyone all the bond claims for which Travelers now seeks indemnity.  Doc. 132-1 (¶6); Doc. 132-20; Doc. 132-21; Doc. 132-22; Doc. 132-49; Doc. 132-95.  Yet Travelers failed to *even just help* Mid State in its own efforts to get control of the project funds and the project.[5]

---

[4] US Coating's payment defaults were egregious enough to compel Travelers to act.  But US Coating's and Mr. Washington's intentional diversion of the project funds away from the escrow account independently compelled decisive action from Travelers.

[5] Doc. 132-24 (pp. 104-6).  As shown herein, Mid State attempted to assert *Travelers'* stakeholder rights and it pursued injunctive relief to have the project funds escrowed, but Travelers failed to timely join in Mid State's efforts.

4/376992.1

## Factual Summary

Key facts that show why Travelers should have taken timely and appropriate action (i.e., compulsory action to actually seize the funds) include the following:

- When Travelers issued the bonds for the project, Travelers knew that Mid State was the only reason Travelers was bonding the project, knew that US Coating was not reliable,[6] and knew it was vital that Mid State serve as the subcontractor actually performing the vast majority of the work.  Doc. 132-16; Doc. 132-17 (pp. 14-16, 36, 40); Doc. 132-18.  Travelers failed to help the one party it found to be reliable.

- Travelers failed to take appropriate action even though it knew that US Coating was diverting the payments on this $13,613,000 project away from the escrow account where US Coating had promised to escrow them for safeguarding for paying subcontractors bills, and to assure their proper use so that the project could be completed for the contract balance. Doc. 132-1 ¶4; Doc. 132-9; Doc. 132-14.  Travelers knew this beginning in May and June of 2011.

- Travelers failed to take appropriate action even though it knew or should have known that US Coating and Mr. Washington had lied about paying Mid State's $1,000,000 claim.[7]  Doc. 132-25; Doc. 132-24 (pp. 149-55).[8]  Travelers had identified this key issue before July 26, 2011.

---

[6] Travelers' key underwriter witness, Stacy O'Neal was already performing an underwriting review of US Coating for other projects.  Ray Lorah, Mr. O'Neal's boss, had at one point established as precondition to the issuance of the ERDC bonds was that US Coating not have been rejected on other projects at the time the ERDC bonds were issued. Doc. 132-17 (pp. 14-16, 36, 40); Doc. 132-18.

[7] On July 26, 2011 Travelers emailed confirming **_repeated prior_** conversations where US Coating and Mr. Washington had told Travelers they had paid Mid State.  Doc. 132-25. So by July 2011 Travelers knew it came down to whether they could produce the checks showing all those payments.

[8] Ms. Ziv-Goldstein's testimony is confusing as to whether she ever got the checks showing payment for April 2011. The bottom line is she did not.  Once again Travelers' 30(b)(6) witness and main claim handler could not testify about one of the key issues in this case.  Mid State was never paid for April. Doc. 132-1 (¶5).

- 6 -

- Travelers failed to take appropriate action even though Travelers knew that US Coating was not even paying sums undisputedly due Mid State. US Coating challenged only a fraction of Mid State's billings, yet did not pay the undisputed portions. Doc. 132-26; Doc. 132-27. Travelers knows that is classic bad faith conduct. *Travelers Indem. Co. v. Wetherbee,* 368 So. 2d 829, 834-35 (Miss. 1979). Travelers was put on notice of this in July 2011. Doc. 132-28; Doc. 132-29.

- Travelers failed to take appropriate action even though US Coating never provided a meaningful explanation for why it was not paying. Travelers itself cannot meaningfully explain how US Coating disputed Mid State's claim, instead being able to only vaguely refer to some alleged overbilling in some undefined amount. All Travelers' key person handling this claim could testify to was that the information on the alleged dispute was "somewhere" in the un-indexed 90,000 pages of documents produced by Travelers. Doc. 132-24, pp. 60-69. Despite her testimony, her own e-mail confirms she never got any meaningful details, but instead got mere "narratives" from US Coating and Earl Washington. Doc. 132-30.

- Travelers failed to take appropriate action even though Travelers knew that US Coating had billed and collected from the Corps for Mid State's work, but still had not paid Mid State. Doc. 132-9; Doc. 132-24 (pp. 126-128); Doc. 132-28; Doc. 132-29. Travelers was on notice of this in May 2011.

- Travelers failed to take appropriate action even though it knew US Coating had billed the Corps for other subcontractors work, and that US Coating had collected from the Corps under those billings and still did not pay those subcontractors. Doc. 132-24 (pp. 95-97).

- 7 -

- Travelers failed to take appropriate action even though Travelers knew that US Coating's actions of billing the Corps and then not paying Mid State and other subcontractors/suppliers constituted a repeated series of violations of the law under the Federal Prompt Payment Act.  Doc. 132-24 (pp. 95-97);[9] Doc. 132-28; Doc. 132-29; Doc. 132-32. Travelers was first put on express written notice of this in July of 2011.

- Travelers failed to take appropriate action even though Travelers was being repeatedly advised by the Corps that US Coating was floundering on the project and not paying its bills.  Doc. 132-24 (pp. 101-03); Doc. 132-32; Doc. 132-33; Doc. 132-34; Doc. 132-35; Doc. 132-36; Doc. 132-37. Travelers was first put on notice of this in June 2011.  Travelers' own pleadings confirm those conditions continued unabated into 2012.  Doc. 132-39 (¶11).

- Travelers failed to take appropriate action even after US Coating failed to live up to its commitments in an early August 2011 conference call to escrow all funds with Travelers, instead belatedly months later sending only part of one payment.  Doc. 132-24 (pp. 144-145); Doc. 132-41; Doc. 132-42; Doc. 132-43; Doc. 132-44; Doc. 132-45; Doc. 132-46; Doc. 132-47; Doc. 132-48.

- Travelers failed to take appropriate action despite the fact US Coating repeatedly hid the ball about critical information (including regarding a books-and-records review) necessary to understand the project, its status, the finances, etc. Doc. 132-24 (p. 92). The whole purpose of the books-and-records review was "to make sure that the payments were going where they were supposed to go and to basically trace the money". Doc. 132-204; Doc. 132-204; Doc.

---

[9] Travelers' testimony was that Prompt Payment Act violations go hand-in-hand with payment bond claims – that one necessarily follows from the owner.  Travelers' knowledge about that result demonstrates why Travelers was compelled to act – because it knew those violations were going to lead to payment bond claims.

132-205.  This game playing continued unabated for months.  In fact, Travelers never got the information.  Travelers let US  Coating get away with not providing anywhere near the standard required information.  Doc. 132-42; Doc. 132-48; Doc. 132-50 (pp. 17-18, 20-28).  Travelers let US Coating get away without providing any records related to Mid State's $1,000,000 claim. Doc. 132-50 (pp. 68-69); Doc. 132-107.  Travelers could not even confirm it was reviewing the records for the right company.  The review was supposed to be of US Coating, which again is "U.S. Coating Specialties & Supplies, LLC."  The financial statements Travelers reviewed were for "U.S. Coating Specialties & Suppliers, Inc." Doc. 132-50 (pp. 37-39); Doc. 132-104.

### Further Facts

Mid State has been in business for over fifty years as a well-respected prime contractor. Doc. 132-17 (p.11); Doc. 132-51.    Mid State, US Coating and Earl Washington had worked together before.  US Coating had been a subcontractor to Mid State for flooring coatings and coverings work.  That is the kind of work US Coating traditionally did.  Doc. 132-1 (¶16); Doc. 132-18.  Before the ERDC project the largest job on which US Coating had served as the prime contractor was an $800,000 job – a far cry from a $13,613,000 project for the Corps to build a multi-story building to house supercomputers.  Doc. 132-23 (p. 18).  Travelers knew or should have known this since it had been underwriting US Coating both generally and in particular for this job.  Doc. 132-17 (pp. 14-36, 36, 40).

As Travelers' own documents confirm, the plan all along for the ERDC project was for Mid State to help US Coating perform the job. Doc. 132-18.  As noted above, Mid State was to serve as the major subcontractor with a major portion of the total job under its subcontract, including in particular all the key work during the early portion of the project.  This was because

that work in the early portions is typically the most critical in terms of staying on schedule, and it was the kind of work with which US Coating did not have any real experience.  Doc. 132-1 (¶¶16-17).  Further, though Travelers tries to claim that Mid State should have known it was dealing with rouge actors, that was not Mid State's past experience with US Coating and Mr. Washington.  Going in to this Mid State did not question their integrity.  Mid State was shocked to see how US Coating and Mr. Washington acted.  Doc. 132-1 (¶16); Doc. 132-52 (p. 6).

As noted above, Mid State was to provide indemnity support.  Plus, Mid State was supposed to be the major subcontractor with the major portion of the work.  Also, US Coating had no experience as prime contractor on a job like the ERDC project.  So, Mid State helped US Coating with the bidding, including by putting together a complete bid that it prepared itself.  Mid State obtained quotes and pricing for the entire project – not just on the parts that would be under its subcontract, but for all of the work.  That way Mid State would have a good handle on what the entire prime contract price would be before the bid was submitted.  Doc. 132-1 (¶¶16-17).

Mid State obtained such a global set of price commitments from subcontractors and suppliers and passed that information along to US Coating.  US Coating took Mid State's numbers and used them in US Coating's bid without modification.  Doc. 132-1 (¶¶ 16-17); Doc. 132-95 (pp. 11-16, 42-43, 49).  This means the prime contract was based upon the quotes and prices that Mid State had obtained for the entire project scope.  This means that if Mid State had been allowed to takeover completion of the job (as it was continually requesting), it already had the quotes, prices and commitments from subcontractors and suppliers needed to complete the prime contract.  This means Mid State can show that if Travelers had taken timely action to get

- 10 -

control of the project funds and the project, Mid State could have finished the project for the remaining prime contract funds.  Doc. 132-1 (¶¶ 16-17); Doc. 132-20; Doc. 132-21; Doc. 132-22; Doc. 132-49.

When US Coating was awarded the job, it became necessary for US Coating and Mr. Washington to follow through with the oral agreements between themselves and Mid State regarding how the ERDC project would be set up.  One part of that was that they would enter into agreements regarding how to protect the project funds.  The project funds were to be sent to an escrow account from which Mid State could veto disbursements.  This would allow Mid State to see that the funds were not improperly diverted.  The first of these agreements was the June 23, 2010 *Agreement Regarding Bonding Credit*.  Doc. 132-1 (¶ 4); Doc. 132-53.

Over the next several months Mid State attempted to get US Coating and Mr. Washington to follow through with all the various agreements and documents needed to actually set up the escrow fund.  Mid State also during that time worked to get executed the subcontract by which Mid State would be the major subcontractor.  What should have been a simple process became an extraordinarily protracted and difficult process because US Coating and Mr. Washington would not live up to their commitments and used all kinds of alleged excuses to try to justify not following-through.  They kept trying to say the Corps and the Small Business Administration would not approve certain things in the escrow documents.  In any event, the Subcontract and the various agreements regarding escrow were not executed until ***after*** Mid State had been told that the government had approved them.  We now know (but did not know then) that US Coating and Mr. Washington were lying, because they did not get the

government's approval of the documents.  Doc. 132-1 (¶ 18); Doc. 132-15; Doc. 132-52 (pp. 34-35); Doc. 132-54; Doc. 132-55; Doc. 132-56; Doc. 132-57; Doc. 132-58.

Once the documents were finally executed, Mid State went to work under its Subcontract and provided supervisors for the job under the Employee Lease Agreement. Doc. 132-1 (¶18).

Mid State was involved in the billing process with the Corps for the job.  US Coating, Mid State and the Corps would meet and agree on what could be billed for Mid State's work. Mid State then billed US Coating accordingly, and US Coating then added its mark-ups to Mid State's billings and passed them through.  This meant that US Coating billed and collected for Mid State's work without deduction except in a few minor instances.   Doc. 132-1 (¶6).[10] Exhibits 61-63 are recaps of the billings and payments which demonstrate the above.

As noted above, the Corps' payments were supposed to go directly into the escrow account.  Except for US Coating's first billing (which did not include work by Mid State), all the payments issued prior to the two payments issued in May 2011 did go into the escrow account. And just as importantly until May 2011 Mid State was paid for the work it had done under its Subcontract. Then in May 2011 US Coating quit putting the project funds into the escrow account and quit paying Mid State.  Doc. 132-1 (¶¶ 10-11).

Mid State immediately took action.  On May 19, 2011, Mid State wrote US Coating and Mr. Washington demanding that they follow through with their obligations to escrow the project funds. Doc. 132-64.  On May 25, 2011 Mid State filed its demand for arbitration to enforce the escrow documents (seeking both preliminary and final injunctive relief) and to collect the sums owed Mid State. Doc. 132-65. The agreements between Mid State, US Coating and Mr.

---

[10] See Doc. 132-1 at ¶ 6 for an explanation of the billings.

Washington required arbitration.  See Doc. 132-3 (article 14.0), Doc. 132-5 (section 9) and Doc. 132-6 (section 11).

On May 31, 2011 Mid State wrote US Coating setting out the details as to the diverted funds for the March billings (collected from the Corps on May 3, 2011) and the April billings (collected from the Corps on May 18, 2011). Doc. 132-9.  Mid State also recorded how payment for both of those months' billings ($482,137 for March and $332,700 for April) were now past due, as well as sums owed under the Employee Lease agreement were past due.  ***Travelers was copied on that letter***.  Doc. 132-9.  Mid State invites the Court's attention to how Travelers was also copied on additional key letters after this date.  The record shows that Travelers was either copied on letters, or within a short period of time advised such as via a copy of a follow-up letter.

On June 7, 2011, Mid State put US Coating on notice that if US Coating failed to pay Mid State, then Mid State would stop work on June 14, 2011.  Doc. 132-66.[11]  On June 13, 2011 US Coating made an initial payment of part of the amounts owed for March 2011's payment application. US Coating attempted to make certain improper deductions. When Mid State fought back, US Coating yielded, recognizing its error.  Doc. 132- 1 (¶11); Doc. 132-10.  However, US Coating still refused to pay for April's work, even though US Coating had collected for Mid State's April work back on May 18th.  So, Mid State had no choice but to stop work.  At that point Mid State had not been paid for April, the project funds (Mid State's and otherwise) were not being escrowed, and Mid State had work for all of May and half of June for which it had not been paid.  This was $854,459 of Subcontract work, plus the $160,993.54 in sums owed under the Employee Lease Agreement.  Mid State was over a $1,000,000 in the hole with US Coating,

---

[11] Though Travelers was not copied on the June 7th letter, it was copied on a June 13th letter that warned about the work-stopped.  Doc. 132-10.

could not get paid, could not get funds escrowed, and could not get honest answers.  Mid State was however willing to return to work if the defaults were cured.  Doc. 132-1 (¶¶ 5, 7, 11, & 19); Doc. 132-121.

On June 16, 2011, US Coating wrote threatening to terminate Mid State's Subcontract, with a copy of Travelers. Doc. 132-67.  Of course this was a critical threat.  Over and above the fact that US Coating had no grounds for such a termination, everyone knew that Mid State was the key subcontractor with the key work and that US Coating was in no position to finish the job without Mid State.  Mid State responded appropriately.  This included by amending its Demand for Arbitration.  Doc. 132-1; Doc. 132-68; Doc. 132-69 (copied to Travelers).

A couple of days later US Coating came to Mid State, acknowledged that it was in over its head, and asked for Mid State to find a way to take-over the job and finish it.  Doc. 132-1 (¶19); Doc. 132-70.  Mid State found a way to structure a deal so that US Coating could turn the job over to Mid State, and Mid State prepared the documentation accordingly.  Doc. 132-71. Mid State sent all of those documents to US Coating for review, but never heard back.[12] Doc. 132-1 (¶19).  Instead, the next response that Mid State got was a notice from US Coating that it was default terminating Mid State and kicking it off the project. Doc. 132-73.  That letter was received on July 5, 2011, and Mid State responded appropriately (with copy to Travelers) on the same day.  Doc. 132-121.

The Court should be aware, however, of another key event that occurred just a couple of days before US Coating's wrongful default termination of Mid State.  On June 29, 2011 Mid

---

[12] Travelers was not involved in these take-over negotiations.  It was however advised of them within about a week their starting. See Doc. 132-72 (copied to Travelers).  Note how that letter also confirmed that US Coating and Earl Washington were diverting the project funds.

4/376992.1

State met with Travelers. Doc. 132-1 (¶15).  At that meeting the US Coating situation was discussed.  *Id.*  At that meeting Travelers ***agreed*** with Mid State that Mid State needed to file a formal bond claim so that Travelers get involved.   On June 30, 2011 Mid State did its part, sending in its bond claim. Doc. 132-14.

On July 14, 2011 US Coating wrote regarding Mid State's payment application for the work for the month of May 2011.  Doc. 132-27.  In that letter US Coating bogusly claimed that it was entitled to certain deductions, purportedly because the Corps had made cuts to certain of Mid State's line items for billings.  Note however that even with these ill-founded cuts, US Coating admitted that it owed ***$259,855*** out of the $310,261 for Mid State's May billing.  Mid State responded on July 21, 2011.  Doc. 132-28.  In its response Mid State showed exactly how each alleged deduction was ill-founded.  Mid State warned about the Prompt Payment Act issues raised by US Coating's actions.  Mid State copied that letter to Travelers.  *Id.*

One week later US Coating responded.  Doc. 132-29 (see US Coating letter as Ex. A thereto).  But its response was nothing more than a dodge.  Mid State, with copy to Travelers, replied on that same day.  Doc. 132-29.  Mid State pointed out US Coating's own project records that refuted US Coating's alleged entitlement to deductions. *Id.*  Mid State again pointed out the Prompt Payment Act issues.  *Id.*  Mid State also expressly pointed out that US Coating was not paying even the undisputed sums. *Id.*  By the end of July 2011 Mid State had documented to Travelers (using US Coating's own documents) how US Coating's alleged disputes with Mid State's billings were bogus, how US Coating was not even paying the undisputed portions of those billings, and how US Coating was violating federal law with its billings.

4/376992.1

And here is a key point.  By that point Travelers knew US Coating was playing games. On July 26, 2011, Robbi Ziv-Goldstein – the key claims persons for Travelers – wrote Earl Washington confirming her ***repeated prior requests*** for copies of the checks that US Coating "said" had been sent to pay Mid State.  Doc. 132-25.  By July 2011 Travelers knew it all came down to whether US Coating could produce checks proving payment – and Travelers surely knew how producing the checks would be very easy if they actually existed.  By the end of July 2011 Travelers had to know that US Coating was playing games with Mid State's money.  That is before one considers that by the end of July 2011 Travelers also already knew that it was dealing with an unreliable actor in US Coating, that US Coating had kicked Mid State (the key subcontractor) off the job, that US Coating was diverting project funds away from the escrow account, and that the Corps was hammering on US Coating's grossly deficient performance on the job.  Yet Travelers still did not take appropriate action.

Mid State, however, kept at it.  In August 2011 Mid State wrote a series of letter to (and/or copied to) US Coating, the Corps and Travelers.  Mid State repeatedly pointed out US Coating was not responsible and was in over its head.  Mid State pointed out US Coating was driving the project into the ground.  Mid State pointed out how US Coating was grossly inexperienced and how Mid State was critical to finishing the job.  Mid State pointed out how US Coating was running up bond claims which Mid State demanded be stopped.  Doc. 132-74; Doc. 132-75; Doc. 132-76.

Also, on August 1, 2011 Mid State over-nighted to Travelers additional documents further confirming US Coating's and Mr. Washington's egregious misconduct. Mid State warned Travelers about US Coating's and Mr. Washington's tactics.  Mid State

- 16 -

warned Travelers to not fall for their tactics.  Mid State begged for Travelers' help.  Doc. 132-1 (¶14); Doc. 132-15; Doc. 132-77.

On Friday, August 5, 2011 Travelers participated in a conference call with Mid State and US Coating. Doc. 132-24 (p. 205).  The call discussed about whether US Coating would escrow the project funds with Travelers. *Id*.  This issue came up because US Coating had just been paid additional funds by the Corps. Doc. 132-78.  US Coating claims such an agreement was dependent on the Corps' consent to participate.  Doc. 132-52 (pp.23-25).  Mid State drafted the documents for an escrow with Travelers and circulated them on August 9, 2011.  Doc. 132-79.  Yet just like the history proved would happen, US Coating failed to even respond.  Doc. 132-1 (¶19).  When Mid State sent those drafts, Mid State again warned against leaving the funds unprotected even with this alleged promise to escrow with Travelers.  On August 9, 2011 Mid State called on Travelers to immediately demand the Corps send the funds to Travelers.  Doc. 132-80.

As noted above, US Coating contends that the August 5, 2011 voluntary escrow commitment was conditioned on the Corps' approval, while Travelers indicated there was no such precondition.  Regardless of whether such a condition existed, no such voluntary escrow arrangements to *secure* the funds (i.e., to keep US Coating from getting them so that it could continue to divert them) would work unless the Corps agreed to send the funds to Travelers.  On August 8, 2011 the Corps said it ***would not agree*** to participate in such a voluntary escrow arrangement. Doc. 132-81. So, by then *Travelers knew that it was not going to work-out to actually secure the funds* because the Corps said it was not going to send the funds to Travelers.

- 17 -

So when Travelers got Mid State's August 9, 2011 letters, Travelers *already knew* the voluntary escrow arrangements were not going to work.  Yet Travelers still failed to act appropriately.

By August 15, 2011, the funds still were not secured.  As noted above, Travelers had the right to send the Corps a stakeholder letter demanding the funds.  Travelers had not written that stakeholder letter.  So, Mid State wrote the letter itself.  Doc. 132-82.[13]

Over the next several days there were various additional exchanges between Mid State and the Corps.  Doc. 132-83; Doc. 132-84; Doc. 132-85.  The Corps' repeated response was that since these stakeholder rights belonged to the surety, Travelers, and not Mid State, must write the letter.  Doc. 132-83; Doc. 132-84.  Mid State repeatedly wrote Travelers asking Travelers to join in Mid State's letters.  Doc. 132-86; Doc. 132-87.  But Travelers failed to do so.  Doc. 132-24 (pp. 104-06).  In fact, Travelers failed to do so following an August 24, 2011 email from the Corps' attorney that literally laid out the road map for what Travelers should do to assert stakeholder rights.  Doc. 132-88.  That email invites a written assertion of stakeholder rights specifying the claim amounts so that the Corps would know how much to withhold.[14] This is particularly true when that email is viewed in the context of all the correspondence the Corps had

---

[13] Travelers points out how Mid State's August 15, 2011 letter referred to Mid State's indemnity liability.  What Travelers ignores is Mid State's August 22, 2011 (Doc. 132-122) written after Mid State attempted to assert *Travelers'* stakeholder rights and after Mid State could not get Travelers' simple joinder in that assertion of stakeholder rights as further described in the text above. In that August 22nd letter Mid State expressly asserted its rights to "*pro tanto* discharge and other relief from liability as to the bonds."  So, after Travelers would not even perform the simple act of joining in Mid State's attempts to assert stakeholder rights, Mid State went on record that Travelers' inactions caused loss of Travelers' rights to indemnity. Yet again we have proof that shows Travelers was asleep at the switch.  Warnings of loss of indemnity rights could not even draw a reaction.

[14] Travelers own documents show that by August 26, 2011 it had Mid State's claim with an amount of $1,087,000, Gipson Steel's claim with an amount of $435,778, and Birdsong Construction's claim with an amount of $326,973.  Doc. 132-106.  So it had more than enough claims to act.

- 18 -

been sending about US Coating's defaults, which would indicate that the Corps was interested in having a responsible party get control.[15]

All the while, Mid State kept pursuing in the arbitration proceedings injunctive relief to mandate the escrow of the project funds. Doc. 132-1 (¶20). Despite US Coating's and Mr. Washington's delays, an arbitrator was finally appointed and an initial hearing able to be scheduled on August 30, 2011. The Arbitrator issued a preliminary injunction mandating escrow of the funds. Doc. 132-89. Mid State immediately put Travelers on notice, but Travelers still failed to act, even though US Coating and Mr. Washington refused to comply. Doc. 132-89. One month after the initial hearing, the final arbitration hearing was held. Following post-hearing briefing, a final award was issued at the end of November 2011, granting Mid State final injunctive relief for full escrow and monetary relief for payment of all sums claimed. Doc. 132-1 (¶21); Doc. 132-90. Mid State then filed in this court to enforce the arbitration award (both as to the injunctive relief and the monetary relief. Doc. 132-90. Only then did Travelers take the first step toward asserting stakeholder rights. Doc. 132-91; Doc. 132-92. By that point US Coating had returned to work (albeit still deficiently) and the Corps refused Travelers' stakeholder request. Doc. 132-1 ¶7; Doc. 132-93. Travelers did not then promptly follow-up with a request for injunctive relief or other court relief. Within a few days US Coating filed for bankruptcy protection, doing so as a result of Mid State's efforts to enforce the arbitration award (both as to the injunctive and monetary relief) in this Court. Doc. 132-1 (¶21).

---

[15] Travelers has tried all kinds of excuses to say why it has not sent in a stakeholder letter. Travelers has said that Mr. Robinson told Ms. Ziv-Goldstein on August 8, 2011 that the Corps would never hold funds under a stakeholder letter. But that email does not say that, instead addressing only voluntary escrow arrangements under the Anti-Assignment Act. See Doc. 132-81. Travelers has also said the Corps maintained that claims had to be actually paid before the Corps would withhold funds per a stakeholder letter. But that is not what the August 24, 2011 email says at all. Instead, it refers to "possible claims". See Doc. 132-88.

- 19 -

Though Travelers claims there was nothing it could have done to get control of this situation like Mid State had requested beginning in the summer of 2011, Traveler finally did exactly what Mid State says Travelers should done in the summer of 2011.  In February of 2012 Travelers finally filed to take-over the project and to seize the project funds.  Doc. 132-39; Doc. 132-40.  As a result Travelers in April of 2012 got exactly the relief Travelers should have achieved with mitigating effect in the summer of 2011. Doc. 132-94.

All the while, Mid State had been and continued begging for the chance to complete the job. Mid State knew that it was the party best situated to complete the project for the lowest price. Doc. 132-112; Doc. 132-113.  Yet Travelers never gave Mid State that chance.  Travelers told Mid State it would have to get its own new bond from *another bonding company* in order to have that chance.  Doc. 132-1 (¶22).  That however, was an impossibility with all the outstanding claims on this project. *Id.*  It was almost patently inappropriate, because as Travelers' own witnesses admitted, Mid State had already once effectively bonded the ERDC job by lending of its bonding credit to US Coating.  Doc. 132-17 (p. 29); Doc. 132-98 (pp. 90, 175-76).  Mid State was never given the chance to show how it could have completed the job for less.

Again, Mid State had commitments from subcontractors and suppliers that were used to develop the original contract sum.  Mid State had the commitments to be able to show that it could have completed the project for a direct cost[16] of $11,035,857, which was $589,717.67 ***less*** than the remaining project funds if Travelers had acted to get control of the project funds by no

---

[16] Direct costs are the costs incurred on the job.  There are other indirect costs such as home office overhead, which covers things like light bills, phone bills, executive salaries, etc. at the home office.  However, Mid State did not need this job to bear any home office overhead costs.  Mid State survived as a company (i.e., had its home office overhead paid) without getting any additional funds from the ERDC project.  So, Mid State could have finished the ERDC project without needing any additional home office funds from the ERDC project, because Mid State's other jobs and actions were sufficient to cover all those costs.  Doc. 132-1 (¶17).

later than September 21, 2011, which was almost four months after Travelers was first put on notice.   Doc. 132-1 (¶17); Doc. 132-20; Doc. 132-21; Doc. 132-22; Doc. 132-49; Doc. 132-95 (pp. 11-16, 42-43, 49).   That is, Mid State could have had $589,717.67 left over to fund satisfaction of the sums owed Mid State or to fund payments to other subcontractors and suppliers.

Further, remember that US Coating simply took Mid State's numbers from its estimate and used them as US Coating's own numbers. Doc. 132-95 (pp. 11-16, 49). This means that US Coating's cost information would be that secured by Mid State.  Travelers' own construction consultants reviewed that information and concluded that even in late March of 2012 that there were enough in remaining contract funds to complete the project.   Travelers' construction consultants in March 2012 effectively vouched in Mid State's ability to have completed the ERDC project for the then-remaining contract funds. Doc. 132-116.  The consultants' caveat was that they were concerned about relying upon information from US Coating.   What the consultants did not know was that the numbers they were reviewing actually came from Mid State.  Travelers' failure to communicate with and work with Mid State caused further loss.

Though it got control of the project in April 2012, Travelers did not secure bids for completion until September of 2012, and did not strike a deal for completion until December of 2012.  Doc. 132-110 (at 18151 showing that completion contractor payment was not made until December 2012); Doc. 132-114; Doc. 132-115; Doc. 132-117.

### Mississippi Law on Sureties' Rights to Indemnity

Travelers contends that Mid State has no defense to indemnity because Travelers has *carte blanche* to pay claims as it sees fit and because Travelers has no duty to mitigate.

Travelers contends that in order for Mid State to defeat Travelers' indemnity claims, Mid State must show that Travelers acted fraudulently, or, with a lack of good faith, which according to Travelers requires some kind of super-heightened bad faith conduct.

Travelers cited *Guarantee Co. of North Am. v. Pitts*, 30 So. 758 (Miss. 1901), for the supposed proposition that so long as a surety pays a claim without having committed fraud, then the indemnitor must reimburse the surety for whatever the surety paid.  First, the *Pitts* case's reference to the word "fraud" was obviously premised on the language of the particular indemnity agreement involved in that case, an agreement which said that the surety's sworn statement was "conclusive evidence (except for fraud)" as to the amounts for which the indemnitor would be liable.  Second, the *Pitts* opinion goes on to state that payments must in any event be made in good faith.  Third, the way that *Pitts* used the terms "good faith" and "fraud" shows that what the *Pitts* Court actually did was construe the word "fraud" (which again was an express term in that case's indemnity agreement) as legally meaning lack of good faith as opposed to truly fraudulent conduct.  *Pitts,* 30 So. at 759.  The Court stated that payments must be made "without fraud – that is, in good faith".  In other words, *Pitts* did not prescribe true fraud as the applicable standard, but instead judicially constructed the contract term of "fraud" as something less than true fraudulent conduct.  So fairly read, *Pitts* does not state the "fraudulent conduct" standard argued by Travelers.

Travelers acknowledges lack of fraud is not the sole standard, and that a surety also cannot recover indemnity for losses that are not incurred in good faith.  However, Travelers cites cases from other states to try to convince this Court that a super-heightened standard applies to

define the kind of lack of good faith necessary to defeat an indemnity claim.  Travelers claims that only extraordinarily egregious conduct can serve as a defense, such as for actual ill-motive.

Notably, Travelers relies primarily on cases applying Texas law.  That is a key point, because Texas does not recognize the covenant of good faith and fair dealing as an implied term in a surety indemnity agreement. *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 282 (Tex. 1998).  Moreover, the Texas Supreme Court in its ruling recognized that its law therefore diverges from that of other states which require that the surety act in a "reasonable" fashion when addressing claim issues, or suffer a bar against recovery.  *Id.* at 285.

Multiple other jurisdictions set a different standard, particularly where those jurisdictions recognize the implied covenant of good faith and fair dealing as applicable to surety agreements. *Hartford v. Tanner,* 910 P.2d 872, 877-81 (Kan. Ct. App. 1996) (covenant of good faith and fair dealing implied in surety agreement and is imposed on every term therein; surety must act with reasonable care; rejected premise that only truly egregious conduct like fraud could be a defense); *City of Portland v. George D. Ward & Assoc., Inc.*, 750 P.2d 171, 174-75 (Ore. Ct. App. 1988) (same); *Rush Presbyterian St. Luke's Medical Center v. Safeco Insurance Company of America*, 712 F.Supp. 1344 (N.D. Ill. 1989) (only a showing of negligence is required to defeat indemnity claim); *Hawaiian Ins. & Guar. Co. v. Higashi*, 675 P.2d 767, 769 (Haw. 1984) (surety must act reasonably in order to have indemnity); *Arntz Contr. Co. v. St. Paul Fire & Marine Ins. Co.*, 54 Cal. Rptr.2d 888, 898-99 (Cal. Ct. App. 1996) (surety contracts include implied covenant of good faith and fair dealing; unreasonable conduct defeats indemnity; indemnitor not required to prove surety had evil motive).

- 23 -

Mississippi law falls within the latter group of jurisdictions, not the Texas rule.   In *Perkins v. Thompson*, 551 So. 2d 204 (Miss. 1989), the Mississippi Supreme Court ruled "[e]very contract, including bond indemnity contracts, has implied covenants of good faith and fair dealing". *Id.* at 209.  Also, the Court ruled that in order to recover indemnity the surety must show that its expenditures were "reasonable", "necessary" and incurred "in good faith". *Id.* at 209.  *Perkins'* requirements of fairness, reasonableness and necessity set a standard that is a far cry from Travelers' Texas law standard that would redress only fraud and heightened bad faith conduct.  *Perkins* fits squarely with the approach taken by Kansas, Oregon and the other states noted above.

Further, in *Horne v. State Building Comm'n*, 103 So. 2d 373 (Miss. 1958), the Mississippi Supreme Court further interpreted both *Pitts* and a surety indemnity agreement.  In *Horne*, the indemnitor claimed that the trial court improperly charged it with certain expenditures, but the Mississippi Supreme Court affirmed the trial court's decision that those expenses were chargeable against the indemnitor.  Importantly though, the surety challenged the trial court's ruling that the indemnitor was not liable for certain other charges because they were not reasonably or properly incurred.  The trial court found that certain material invoices were not properly chargeable to the job, that the surety had failed to promptly settle certain claims (thereby needlessly incurring interest and attorneys' fees), and that the surety had performed some repair work that was not the contractor's responsibility under the contract.  The Mississippi Supreme Court made no reference that these expenditures for which indemnity was denied resulted from fraud, ill-motive or some other super-heightened misconduct.  Instead, the opinion shows they simply were not generally proper, i.e., not necessarily or reasonably incurred, and the

- 24 -

Mississippi Supreme Court ruled that the surety could not recover for those expenditures.

*Pitts'* rulings as to a requirement of good faith, *Perkins'* requirement as to fairness and reasonableness, and *Horne's* review of the basic underlying propriety of expenditures, all confirm that Mississippi law fits with those states that allow sureties to recover only when they act reasonably, when they act fairly, and when they mitigate as appropriate, and that ill-motive or other super-heightened misconduct is not the only basis to defeat indemnity.

Further, these standards fit with the law of multiple other states. *See Heirn v. St. Paul-Mercury Indemnity Co.*, 262 F.2d 526, 528 (5th Cir. 1959) (surety could not recover indemnity if it allowed contractor to continue on after knowledge contractor was diverting funds; potential defense due to surety's failure to take action to preserve assets); *New Amsterdam Cas. Co. v. Lundquist*, 198 N.W.2d 543 (Minn. 1972) (failure to act after knowledge of improper conduct can cause discharge); *United States Fidelity & Guaranty Co. v. Putfark*, 158 So. 9, 10 (La. 1934) ("any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor"). There can be no question that Travelers had a duty to act. First, the implied covenant of good faith and fair dealing imposed such a duty. *Ferrara v. Walters*, 919 So. 2d 876, 883-84 (Miss. 2006) (once notified of problem, defendant duty bound to take steps to cure problem). Second, under Mississippi law everyone has a duty to mitigate, and one cannot recover damages he could have reasonably avoided. *Travelers Indem. Co. v. Rawson*, 222 So. 2d 131, 135 (Miss. 1969). Travelers lost its rights to indemnity. It failed to act fairly, reasonably, in good faith and to mitigate.

For the reasons noted above, Travelers is wrong to argue that the settlement authority provisions of Sections 3 and 4 of the indemnity agreement vest Travelers with essentially

unreviewable authority to do what it pleases.  Moreover, note the above assumes that Travelers'
actions at issue in this case are in fact governed by those two provisions.  Travelers' argument
about the requirements for fraud and truly egregious conduct is based upon the premise those
two provisions apply to the issues in this case.  That, however, is not a sustainable premise.

Those two provisions deal with how Travelers reacts to a "claim, demand or suit".  They
would only address how Travelers handles a damage issue once it has accrued.  They do not
address Travelers' duties to take action to prevent ***additional*** "claims, demands or suits" from
arising, i.e., they do not purport to address whether Travelers has a duty to mitigate to keep new
claims from arising.  Those provisions must be construed against Travelers, who drafted them.
*Architex Association, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1157 (Miss. 2010).  Travelers is
not even entitled to argue that it gets special protection under those provisions of the indemnity
agreement from the obligations everyone has to act reasonably and to mitigate.

### Travelers Cannot Recover for the Sums Paid to Other Subcontractors

Travelers seeks indemnification for the sums paid Mid State's sub-subcontractors and
suppliers, who were Birdsong Construction and Adam Evans Waterproofing.  Travelers says it
paid Birdsong $336,973.60 and Adam Evans $11,400.  Those, however, are losses Travelers
incurred needlessly.[17]

First, as noted above, if Travelers had acted timely Mid State could have out of the
remaining project funds secured $589,717.67 over and above direct costs to complete.  That

---

[17] Though Travelers tries to claim that Gipson Steel was also a Mid State subcontractor/supplier, that is not correct.
Doc. 132-1 (¶24).  Gipson did not deliver materials until US Coating arranged for the materials' delivery, based
upon representations that arrangements had been made with the Corps and/or Travelers for a joint check, escrowed
funds from Travelers, etc., which did not occur.  Travelers knew those arrangements had not been completed, but
did not advise Gipson.  That resulted in Gipson delivering without secured funds for payment.  Doc. 132-25; Doc.
132-44; Doc. 132-100; Doc. 132-102.  Travelers should have secured the funds before it let Gipson Steel deliver,
and must bear the loss of having failed to do so.   Moreover, Gipson still could have been paid out of the
$589,7171.67 and/or the $663,000 referenced above.

means Mid State could have secured enough to pay both Birdsong and Adam Evans. Travelers' failure to timely act caused the loss of those available funds, so under the cases and facts shown above Travelers must bear the consequences of letting those funds be lost.

Second, Travelers had superior knowledge about another $663,000 in project funds US Coating had stashed in a Capital One account. Ex. 50 (pp. 40); Doc. 132-99. Travelers obtained from US Coating in October 2011 inside information about the exact account number and the amount of the funds there, and did nothing to secure those project funds. That is another $663,000 that Travelers allowed to be lost. Travelers could have secured those funds and used them to pay Birdsong, Adam Evans and Gipson Steel, and still had money left over. Yet Travelers not only did not secure those funds, it did not tell Mid State about their existence, much less the key information about the actual account where they were being held. Between the two fund sources, Travelers let over a $1,000,000 be dissipated.

Third, Mid State's subcontracts with Birdsong and Evans contained pay-if-paid clauses. See Section 6 of the Standard Terms and Conditions in Doc. 132-118 and Doc. 132-119. Those clauses provided that Mid State did not have to pay Birdsong or Evans unless US Coating had paid Mid State. US Coating has not paid Mid State. The Mississippi Supreme Court has ruled that pay-if-paid clauses are enforceable. *Aladdin Construction Co., Inc. v. John Hancock Mutual Life Ins. Co.*, 914 So. 2d 169 (Miss. 2005)(fn. 11 recognizing enforceability of pay-if-paid language as effective to preclude entitlement to legal relief). Travelers' liability as surety was dependent upon Mid State first being liable Birdsong and Evans. 40 U.S.C. § 3133(b)(1) (claimants entitled to judgment only for amounts "due"). Since Mid State has not been paid, the debts were not due, and so Travelers should not have paid. *BMD Contractors, Inc. v. Fidelity*

- 27 -

*Deposit Company of Maryland*, 679 F.3d 643 (7th Cir. 2012).

Regarding the other subcontractors' payment bond claims, Travelers needlessly incurred those losses as a result of its failure to act, and for the reasons set above its indemnity claims are barred.  As Travelers itself admits, in the near term after Mid State was run off the job the bond claims only came from subcontractors who had worked for Mid State.  See page 7 of Travelers' summary judgment memorandum brief and paragraph 3 of Exhibit J to same.  This is because Mid State had essentially all the early work of the in its subcontract, and, US Coating did not recommence work until September 2011. Doc. 132-1 (¶7).  So, timely action by Travelers to seize the funds and get control of the project would have meant control before those claims arose.  Or at least if the over $1,000,000 in funds had been safeguarded as referenced above, there would have been a way to see that the subcontractors were paid.

As to the $1,000,000 paid to the Corps under the performance bond claim, the same is even more true.  Again, as shown above Mid State could have finished the job for the contract balances if Travelers had just acted timely.[18]

## **Preliminary Injunction Standards**

To obtain a preliminary injunction, Travelers must establish that it is likely to succeed on the merits, is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities or hardships tips in its favor, and that the injunction is in the public interest. *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 20 (2008).

---

[18] Travelers' failure to act as noted above also caused its attorneys' fees, costs and expenses, and for the same reasons those claims are barred.  Also, in the interest of brevity, Mid State incorporates by reference Mid State's section of its summary judgment brief entitled "Mid State Did More than Enough" at pages 29-32 thereof.

- 28 -

Preliminary injunctions are extraordinary remedies that should "never be awarded as of right." *Id.* at 24. When faced with requests for preliminary injunctions, "courts' must balance the competing claims of injury and must consider the effect on each party of the granting or withholding the requested relief.'" *Id.* (quoting *Amoco Prod, Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Indeed, the assessment of the balance of equities or hardships is of utmost importance; one Circuit even describes it as the most important factor. *Id.* at 26; *see also Hughes Network Sys. V. Interdigital Commc'ns Corp.,* 17 F.3d 691, 693 (4th Cir. 1994) ("The 'balance of hardships' reached by comparing the relevant harms to the plaintiff and defendant is the most important determination, dictating, for example, how strong a likelihood of success showing the plaintiff must make.").

As such, courts in the Fifth Circuit, as well as the Supreme Court, deny a preliminary injunction movant's request when the balance of equities or hardships favors the nonmovant. *See, e.g., Winter,* 555 U.S. at 26; *Fractus, S.A. v. Samsung Elecs. Co., Ltd.,* 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012) (denying injunctive relief where balance of hardships weighed against injunction); *Aquifer Guardians In Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542 (W.D. Tex. 2011) (denying injunctive relief where harm to defendants outweighed any harm plaintiff may suffer without such injunction); *Investcom Consortium Holding SA v. Wilmot,* No. H-08-2786, 2009 WL 958725, at *6-7(S.D. Tex. April 3, 2009) (same); *Z4 Techs., Inc. v. Microsoft Corp.,* 434 F. Supp. 2d 437, 442-43 (E.D. Tex. 2006) (same); *Tex. First Nat'l Bank v. Wu,* 347 F. Supp. 2d 389, 399 (S.D. Tex. 2004) (noting that movant carries the burden to establish that potential hardships it may suffer if injunction is not granted exceed those non-movant may suffer if injunction is granted); *W. Ala. Quality of Life Coalition v. U.S. Fed.*

- 29 -

*Highway Admin.,* 802 F. Supp. 2d 672, 685 (S.D. Tex. 2004) (noting movant's burden and denying injunctive relief because non-movant's potential hardships outweighed movant's).

Here, Travelers seeks a mandatory injunction, (i.e., one that compels Mid State to do an affirmative act), as opposed to a prohibitory injunction (i.e., one that prevents Mid State from acting). As such, Travelers' burden is even higher, as courts strongly disfavor mandatory injunctions. *Justin Indus., Inc. v. Choctaw Secs., L.P.,* 747 F. Supp. 1218, 1220, n.5 (N.D. Tex. 1990) (noting heavy burden placed on party seeking injunction, and stating that "mandatory injunctions are even less favored than prohibitory injunctions sine they compel a person to act rather than simply maintain the status quo"); *Greenhouse v. Greco,* 368 F. Supp. 736 (W.D. La. 1973) (noting that "it is well established that the requirements for issuing a mandatory injunction are much stricter than the very strict grounds required for the issue of a prohibitory injunction") (citing Volume II, Wright & Miller, Federal Practice & Procedure, § 2942, at p. 733).

When deciding a request for a preliminary injunction, a court must "favor status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." *Wenner v. BDM Enters., Inc.,* 123 F.3d 321, 326 (5th Cir. 1997); *Martinez v. Mathews,* 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

The above factors mandate the Travelers' preliminary injunction request be denied. Travelers is not likely to succeed on the merits. As shown in the previous sections of this brief and in Mid State's response to Travelers' motion for summary judgment, Mid State has compelling defenses to Travelers' indemnity claims based upon Travelers' lack of good faith,

lack of reasonableness, lack of necessity, and lack of fairness in Travelers' action.  Travelers' failure to mitigate is what caused all of this loss.  Those same defenses that prevent Travelers from seeking indemnity likewise prevent Travelers from seeking the posting of collateral.

Travelers also cannot satisfy its burden of showing that it will suffer irreparable injury if the relief is not granted.  Travelers is a huge surety company.  And Travelers has not made any actual showing of irreparable injury.  The affidavit it attached to its motion would show nothing more than it has already paid some claims, but it does not describe how it will suffer (much less *likely* suffer) irreparable injury if Mid State does not post collateral.  Said differently, all Travelers' affidavit shows is that it has purported damage claims.  "Economic damages are not traditionally considered irreparable because the injury can be later remedied by a monetary award."  *Hudson Ins. Co. v. Simmons Construction, LLC*, 2012 WL 869383 (D. Az. 2012).[19] Further, the fact that the indemnity agreement recites that there is irreparable injury does not make it so and does not satisfy the requirement that irreparable injury be shown.  *Id.*  This lack of showing of irreparable injury is fatal, because the United States Supreme Court has ruled that in

---

[19] Travelers cites cases where preliminary injunctions were granted requiring the posting of collateral.  However, only one of its cases was a Mississippi case, and that is the decision of *Hartford Fire Ins. Co. v. Pride Construction, Inc.*¸ 2008 WL 2325658 (5th Cir. 2008).  The *per curiam* opinion was very brief, and noted that there had been shown "ample evidence of liability."  Since the issue of liability was one of the few issues addressed, this indicates that the injunction was issued only after a showing that there was no likely defense to liability, which is exactly opposite from our case.  This indicates that the Mississippi approach on sureties' motions for preliminary injunctions to post collateral is, just like on the underlying defense-to-indemnity issues, not as harsh as Travelers would have this Court believe by its citations to other states' case law.  As noted in Mid State's citations in the main body of this memorandum, other Courts take a different view from that suggested by the cases Travelers cites.  In any event, it must be noted that the *Great American Ins. Co. v. Conart, Inc.*, 2006 WL 839197 (M.D. Ga. 2006) case cited by Travelers, involved the key premise that there was no sustainable defense to indemnity, which is not our case here.  Further, in *Travelers Casualty & Surety Co. v. Ockerlund*, 2004 WL 1794915 (N.D. Ill. 2004), the court noted the defendants did not even argue that they had any defenses to indemnity, and, the defendants did not provide evidence of harm if the injunction were issued, both of which do not apply here.  *Insurance Co. of the West v. Kuenzi Communications, LLC*, 2009 WL 2731349 (D. Ore. 2009) was an unopposed motion.  And in *International Fidelity Ins. Co. v. Solutions to Every Problem, Inc.*¸ 2012 WL 2566775 (E.D. Tenn. 2012), the plaintiff made a sufficient showing to overcome the defendant's defense.  Simply put, when carefully read, Travelers' cases actually show the obvious point that the different facts of each case, and the different state's law involved, are the controlling factors.

order to get a preliminary injunction the movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (citing *Winter v. Nat'l Res. Def. Council,* 555 U.S. at 22) (emphasis in U.S. Supreme Court decision of *Winter*).

Likewise, Travelers' motion fails under the requirement that the equities be balanced. Travelers is a huge insurance company which can afford to await a final determination of whether it has a right to indemnity.  Conversely, as shown by Mid State's Doc. 132-1, ordering Mid State to post collateral as demanded by Travelers will bankrupt Mid State.  Further, that means a preliminary injunction will effectively decide this case before Mid State even gets to have a trial on the merits.  It would be absolutely inequitable to destroy Mid State simply so that Travelers could hold collateral while we await trial.  *See Winter*, 555 U.S. at 26 (balancing of equities called for denial of injunction).

For these same reasons, the public policy interests compel against Travelers being granted a preliminary injunction.  Public policy demands that Travelers not be allowed to destroy Mid State using a preliminary procedural device. Mississippi case law rejects overreaching application of agreements' terms when those terms would yield an unconscionable result.  *Bank of Indiana, N.A. v. Holyfield*, 476 F.Supp. 104 (S.D. Miss. 1979).

Accordingly, Travelers cannot satisfy the factors necessary to have a preliminary injunction issued, considering just the factors in isolation.  That is before one considers the additional burdens Travelers must satisfy for the overlaying rules associated with the fact that Travelers seeks a mandatory injunction, which  as noted above only increases the burden.  *Justin Indus., Inc.,* 747 F. Supp. at 1220, n.5;  *see also Travelers Cas. & Sur. Co. of Am. v. W.P. Rowland Constructors Corp.*, 2012 WL 1718630 (D. Ariz. 2012) (denying preliminary

- 32 -

injunction for posting of collateral, and noting that Travelers bore an even heavier burden since it was seeking a mandatory injunction; also noting that mere contract language does not establish irreparable injury).  And that is before one considers the overlaying rules associated with the fact that what Travelers seeks with its injunction request is to change the *status quo*. *Wenner,* 123 F.3d at 326; *Martinez,* 544 F.2d at 1243.  And that is before one considers that Travelers' injunction would change the *status quo* with extra devastating effect because it would destroy Mid State, and do so without Mid State ever having a chance to be heard on the merits at trial.

For the reasons set out above, Travelers motion for preliminary injunction must be denied.

**RESPECTFULLY SUBMITTED**, on July 5, 2013.

**MID STATE CONSTRUCTION COMPANY, INC.**

By:*/s/ Ralph B. Germany, Jr.*
    Ralph B. Germany, Jr., MBN 8640
    rgermany@babc.com
    Direct Dial: 601-592-9963
    Direct Fax:  601-592-1463
    P.O. Box 1789
    Jackson, MS 39215-1789

**OF COUNSEL:**
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 East Capitol Street, Suite 400
Jackson, MS 39201

- 33 -

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned Ralph B. Germany, Jr., hereby certify that I have served the above and foregoing on all counsel of record via filing with the Court's electronic filing system.  And have served the document on Earl Washington and US Coating:

<u>Via E-Mail and U.S. Mail</u>
Mr. Earl Washington, Individually and as
President/CEO for
U.S. Coating Specialties & Supplies, LLC
125 W. Mayes Street
Jackson, MS
earlwashington@uscoatingspecialties.com

/s/ Ralph B. Germany, Jr.
Ralph B. Germany, Jr.

- 34 -